## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **WHO DAT?, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION** |
| | § | |
| **NFL PROPERTIES, LLC; NEW** | § | **NUMBER** _____ |
| **ORLEANS LOUISIANA SAINTS,** | § | |
| **L.L.C.; THE SECRETARY OF STATE** | § | |
| **OF LOUISIANA, and THE STATE** | § | |
| **OF LOUISIANA,** | § | |
| | § | |
| **Defendant.** | § | |

### ORIGINAL COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF FOR MISAPPROPRIATION OF "WHO DAT"

TO THE HONORABLE JUDGE OF SAID COURT:

For cause of action and upon information and belief, Who Dat?, Inc., as Plaintiff in the above-styled cause, alleges and complains of NFL Properties, LLC (herein "NFLP"), New Orleans Louisiana Saints, L.L.C. (herein the "Saints"), the Secretary of State of Louisiana, and the State of Louisiana as follows:

### I.   NATURE OF SUIT

1.   Who Dat?, Inc. is a company owned by two brothers (Sal and Steve Monistere) born and raised within just a few miles of the Louisiana Super Dome.  They were in attendance for the Saints' first exciting kickoff in 1967, Dempsey's historic field goal, and as season ticket holders experienced many of the ups and downs over the years.  Simply put, they are big Saints fans and are the proud founding members of the "WHO DAT NATION"!

2.   Who Dat?, Inc. developed and nurtured "WHO DAT" for over twenty-five years and was uniquely positioned to reap substantial financial rewards in connection with the 2009-2010

National Football League season.  On the eve of that success, NFLP and the Saints filed public documents falsely claiming ownership and first use of the phrase.  As anyone would have anticipated, the public voiced outrage and State of Louisiana officials publically challenged the claims made by the NFLP and Saints.  Since those entities were not the first users of the phrase and had no standing to make the claims made, they publically conceded that they did not own the phrase.  With that concession in hand, state officials declared victory and further declared that the phrase belongs to the people as it is in the public domain.  As a natural consequence of these actions, Who Dat?, Inc. was not able to obtain the financial fruits of its labor.

3.    This is an action for a request for declaratory relief, cancellation of the trademarks obtained by the Saints on or after February 16, 2007, fraudulent registration, request for permanent injunction, breach of contract, tortuous interference with existing contracts, tortuous interference with prospective contracts, deceptive advertising under Louisiana law, common law unfair competition, common law trademark infringement, state statutory trademark infringement and dilution, federal unfair competition, federal dilution, federal commercial and product disparagement, negligence, fraud, violations of Florida trademark law, and conspiracy.

## II.    THE PARTIES

4.    Plaintiff Who Dat?, Inc. is a Louisiana corporation duly organized and existing under the laws of the State of Louisiana, having its domicile at 518 S. Rampart St., New Orleans, Louisiana, 70113.  Who Dat?, Inc. owns and uses the ōWHO DATö trademark and various derivations thereof that it uses in connection with numerous goods and services it has made commercially available since 1983.  Those goods and services have included 1) providing entertainment services by producing, distributing and performing sound recordings, musical works and live events, 2) operating a fan club, 3) producing and distributing merchandise in the

form of, including but not limited to, apparel, CDs (compact discs), paper goods, advertisements, coffee, champagne, soft drinks, and snack foods, and 4) developing radio and television jingles to promote the brand.  In an effort to protect those marks Who Dat?, Inc. takes action to prevent the infringement, dilution, disparagement, and misappropriation of its marks.

5.   Defendant New Orleans Louisiana Saints, L.L.C. (herein the "Saints") are a Texas limited liability company with its principal place of business at 5800 Airline Drive, Metairie, LA 70003 which own and operates a professional football team, providing entertainment services to the public in the form of competitive professional football games.  The Saints are one of the thirty-two member clubs (herein the "Member Clubs") of the National Football League (herein the "NFL").

6.   Defendant NFL Properties, LLC (herein the "NFLP"), is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 280 Park Avenue, New York, New York 10017, and has been authorized by the NFL and the Saints to use their respective trademarks for commercial purposes, to promote the NFL and its Member Clubs and to protect their trademarks.

7.   Defendant Secretary of State of Louisiana is responsible for the state trademark applications filed through the Louisiana Secretary of State's office and is a necessary party to an action to challenge the fraudulent filings made by the Saints for a "WHO DAT" trademark.

8.   Defendant State of Louisiana (herein "Louisiana") is through its elected officials (principally the Attorney General) is responsible for making false statements regarding the validity of the trademarks of Who, Dat?, Inc. and is a necessary party to an action to declare that "WHO DAT" does not belong to the public domain.

### III.    SERVICE OF PROCESS

9.    New Orleans Louisiana Saints, L.L.C. may be served with process by serving its registered agent, Dennis P. Lauscha, at 5800 Airline Dr., Metairie, Louisiana 70003.

10.   NFL Properties, LLC may be served with process by serving its registered agent, CT Corporation System, 111 Eighth Avenue, New York, New York, 10011.

11.   The Secretary of State of Louisiana may be served with process by serving the Administrative Services Section at 8585 Archives Ave., Baton Rouge, Louisiana 70809.

12.   The State of Louisiana may be served with process by serving the Attorney General of Louisiana at 1885 North 3rd Street, Baton Rouge, Louisiana 70802.

### IV.    JURISDICTION AND VENUE

13.   This Court has original jurisdiction under 15 U.S.C. § 1121, 28 U.S.C. § 1331, 28 U.S.C. § 1338 (a) and (b), and the Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

14.   Who Dat?, Inc.'s claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202; by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

15.   This Court has jurisdiction over the person of Defendant Saints by virtue of its incorporation and commission of tortuous acts in the State of Louisiana.

16.   This Court has jurisdiction over the person of Defendant NFLP by virtue of its conducting business and committing tortuous acts in the State of Louisiana.

17.   Venue is proper in the Middle District of Louisiana because a substantial part of the acts and conduct charged herein occurred in this district.

## V.      FACTS

### A.  WHO DAT?, INC. AND THE GENESIS OF "WHO DAT"

18.  Prior to 1983, there were no brand items with öWHO DATö printed on them, nor were there any marketing or advertising campaigns to promote the mark.  Indeed, the phrase had not been trademarked.

19.  In 1983 Steve Monistere decided to develop a phrase that could be used as a battle cry unique to fans of the Saints.  With the help of Carlo Nuccio, he created Who Dat?, Inc. and trademarked the phrase öWHO DAT.ö  They also produced the original öWHO DATö song featuring Aaron Neville and a handful of Saints players.    That song was recorded at Steveøs place on Bienville Street in New Orleans and a recording was even captured on video by Channel 8 sports reporter Ron Swoboda and aired on the news.  The record was published by the Music Agency and a picture of the album (attached as Exhibit öAö) follows:



20.   A picture of the album cover (attached as Exhibit "B") follows:



21.   The song and this record were an instant success giving birth to the "WHO DAT NATION."  Who Dat?, Inc. was living the dream but the story did not stop there.  Carlo Nuccio sold his interests to Steve's brother, Sal Monistere.   With Sal's experience in media and advertising, the phrase was nurtured and made visible in a number of ways.

22.   Who Dat?, Inc. obtained various other trademarks (herein the "WHO DAT" Trademarks") and entered into license agreements with manufacturers and distributors of merchandise by which such companies are or were licensed to use the "WHO DAT" Trademarks in connection with authorized goods (herein the ""WHO DAT" Merchandise").

23. Who Dat?, Inc. entered into license agreements for use of the ōWHO DATō Trademarks with manufacturers and distributors of sound recordings and a wide variety of apparel and fashion wear, including shirts, headwear, caps, suspenders, underwear, sweatshirts, pants, and other articles of clothing, and other products, such as compact discs, buttons, floor and car mats, glassware, mugs and cups, signs, magnets, pens, lapel pins, coffee, champagne, and pralines. The following is an excerpt from one such license agreement (attached as Exhibit ōCō) entered into in 1984:

<u>AGREEMENT</u>

THIS AGREEMENT between WHO DAT ?, INC., a Louisiana corporation, with principal place of business at 4305 California St., City of Kenner, State of Louisiana, herein called the Licensor, and Tee's Unlimited, a Louisiana corporation, with principal place of business at 2307 Richland Street, City of Kenner, State of Louisiana, herein called the Licensee.

The Licensor is engaged in the business of marketing products and/or concepts based upon the Who Dat? concept, and said name, has been trade marked and assigned in the licensor's name. The Licensee desires to utilize the name and/or characterization.

24. The following is a photo (attached as Exhibit ōDō) of one of the t-shirts that first appeared in 1983 using the ōWHO DATō Trademark:



25.  The following is a list created in 1988 identifying some of the products and vendors under consideration at the time (attached as Exhibit ôEö):

WHO DAT!
1988 MERCHANDISING PROGRAM TARGETED PARTICIPANTS

American Needle --   Headwear 500

New Era --  Headwear 500

Creative Photo  --  Musical Buttons, Musical Caps 250

Golden Squeegee  --  "Fandana" Handkerchiefs 500

Toland  --  Floor and Car Mats 100

Mueller  --  Beverage Bottles w/sipper 250

Bushnell  --  Can Handlers, Ceramic and Glassware 500

Dixie  --  Miniature License Plates 100

F. C. --  License Plate Frames 50

Betras --  Polyurethane Mugs, Cups 500

Country Lane  --  French Milled Soaps 100

Cuddles  --  Suspenders, Headbands 250

EBC  --  Bottle Opener Magnets 100

Freemont  --  Fan Parking Signs 100

Karanne  --  Miniature Mascot Fuzzy Pins, Magnets 250

McArthur  --  Handkerchiefs, Towels 250

P&K  --  Wastebaskets, Wall Decors 500

Thermo  --  Insulated Mugs, Cups, Styrofoam Coolers 500

Trench  --  Youth and Adult T-Shirts, Sweatshirts, Jerseys, 500
                Pennants, Buttons

Creative  --  Pewter Key Rings, Coasters, Lapel Pins 100

Quantasia  --  Lunchboxes, Mechanical Pencils, Ballpoint Pens, 500
                Lapel Pins

Staco  --  Visors 100

Thermometer  --  Thermometers 250

Pro Scent  --  Air Fresheners 150

Scrubbs  --  Scrubb Tops, Pants 500

26. The quality and style of the officially licensed ōWHO DATö Merchandise are controlled and monitored by Who Dat?, Inc.  ōWHO DATö Merchandise has been advertised for

sale through a wide variety of channels, including over the radio and in various catalogs and websites.

27. Entities holding and who have held licenses to use ōWHO DATö Trademarks have invested significant amounts of capital and have devoted substantial amounts of time and effort to the production, marketing and promotion of merchandise bearing the ōWHO DATö Trademarks and have established a significant consumer demand for these items through such efforts. Consumers readily identified merchandise bearing the ōWHO DATö Trademarks as being sponsored and approved by Who Dat?, Inc.

28. Entities holding licenses from Who Dat?, Inc. for ōWHO DATö Trademarks manufacture and/or distribute merchandise bearing such marks in interstate commerce and throughout the United States, where the products are sold in a wide variety of retail outlets, including websites.

29. Who Dat?, Inc. derives income in the form of royalty payments and licensing fees from its Licensees from the sale of licensed merchandise bearing the ōWHO DATö Trademarks. The company also derives income from consumers/customers from direct sales of merchandise and services bearing the ōWHO DATö Trademarks.

30. Who Dat?, Inc. also obtained sponsors to cover the costs associated with printing signs for fans at the games.

31. Who Dat?, Inc. worked with the Saints to the mutual benefit of both organizations. An agreement was struck between Who Dat?, Inc. and the Saints and the NFLP whereby the Saints and the NFLP were granted a license to produce and distribute merchandise which included the respective trademarks owned by the Saints and Who Dat?, Inc. Both entities recognized what the other owned and could contribute. Both entities received royalties from this

licensing deal.  Both entities continued printing other goods bearing only their respective marks but an example of that joint arrangement is the following t-shirt (attached as Exhibit ōFö):



32.   The brothers wrote and produced numerous other songs that have aired frequently on radio, television, in the Super Dome, and so forth. There are several compilation ōWHO DATö compact discs with many of the Who Dat?, Inc.øs songs on them.  One such example that was marketed jointly with the Saints is as follows (attached as Exhibit ōGö):



33.  õWHO DATö Merchandise has been continually available on the market since 1983.

By way of example:

    a.  The She Shop which was located at 409 Bourbon Street, New Orleans, Louisiana,

70130 was in the business of offering t-shirts and novelties for sale to the general

public through its retail location from 1977 through June 2, 1997.  In 1983 The

She Shop entered into a License Agreement with Who Dat?, Inc. to sell various

õWHO DATö Merchandise.  At all times from then through June 1st, 1997, The

She Shop offered for sale Who Dat?, Inc.øs õWHO DATö Merchandise to the

general public.  Although sales were slow for a number of years, he sold some of

that merchandise every year from 1983 and until 1997.

b. Lucille Monistere was a sales assistant for Who Dat?, Inc. from 1983 until around the middle of 2002. At all times from 1983 through mid June of 2002 she offered for sale Who Dat? Inc.øs õWHO DATö Merchandise to the general public. Although sales were slow for a number of years, she sold some of that merchandise every year from 1983 through 2002, including sales in Italy.

c. Mardi Gras Records is currently located at 1013 óA Harimaw Court West, Metairie, LA, 70001 and is in the business of offering Music and Video CD & DVDs (and in this case õWHO DATö t-shirts for a period of time) for sale to the general public and wholesale distributors through its retail location(s). On July 25, 1988 Mardi Gras Records entered into a License Agreement with Who Dat?, Inc. to sell various õWHO DATö Merchandise. At all times since July 25, 1988 Mardi Gras Records has operated under a License Agreement and offered for sale Who Dat?, Inc.øs õWHO DATö Merchandise to the general public. Although sales were slow for a number of years, they sold that merchandise every year since 1988.

## B. THE "WHO DAT" TRADEMARKS

34. To identify and distinguish its goods and services, Who Dat?, Inc. has adopted and used in interstate commerce various names, terms, symbols, slogans, designs, colors and other identifying marks. Some sporadic use even occurred in foreign commerce. These marks are well established at common law, and many have been registered pursuant to the trademark act of Louisiana and registered and/or applied for pursuant to the provisions of the Lanham Act.

35. As mentioned above, Steve Monistere trademarked õWHO DATö at the very beginning. Indeed, the records of the Louisiana Secretary of State reflect that on October 31,

1983 Steve was the first person to obtain a trademark for the phrase. That record is found at Book Number 41-2342 and reflects that the date the phrase was first used for this commercial purpose was October 14, 1983.

36.  Their first-usage claim is simply that Who Dat?, Inc. did something that no one else had done or can lay claim to have previously accomplished -- it made "WHO DAT" popular by arbitrarily attaching the term to its goods and services and creating an inherently distinctive mark or secondary meaning and usage of a previously little-used phrase.

37.  Who Dat,?, Inc. obtained a second trademark for various other categories on November 14, 1983 as is reflected in Book Number 41-2396.

38.  Over the years Who Dat?, Inc. has actively sought to control the artistic and trade values of the commercial use of the phrase and keep it "homespun". The company has also actively sought to protect the integrity of its use. Typically that would result in a cease and desist letter if an unauthorized user refused to cooperate and enter into a reasonable license agreement. However, on occasion Who Dat?, Inc. was required to go farther to protect its interests and it rose to the occasion each time.

39.  On one such occasion, Who Dat?, Inc. was forced to go to court to protect its interests in "WHO DAT" because Allen J. Maxwell of Tee's Unlimited in Kenner produced (without authorization from Who Dat?, Inc.) a white t-shirt with a black fleur-de-lis on the front and the words, "Who dat say dey gonna beat dem Saint, who dat." Tee's Unlimited refused to enter into a reasonable license agreement or cease and desist so litigation ensued. Maxwell argued that the phrase was in the public domain and produced evidence of usage going back many years. Judge Jacob Karno in Gretna declared that despite the prior use, Who Dat?, Inc could establish that it created a "secondary meaning" for the phrase as is explained in the following article (attached as

Exhibit õHö) by Richard Boyd that appeared in the Metro News in December of 1987:

# 'Who dat' paying off for rivals

**By RICHARD BOYD**
*West Bank bureau*

For most New Orleanians, "Who Dat" has become shorthand for proclaiming the triumphs of the Saints. But for Steve and Sal Monistere and Allen J. Maxwell, it means more. It means money.

When the Saints flirted with a playoff bid four years ago, Steve Monistere and his then-partner, Carlo Nuccio, formed Who Dat Inc. The company produced a record featuring Aaron Neville and the 1983 Saints and a black T-shirt with "Who Dat" printed in gold across the front.

In the same year, Maxwell, owner of Tee's Unlimited in Kenner, produced a white T-shirt with a black fleur-de-lis on the front and the words, "Who dat say dey gonna beat dem Saints, who dat."

Doing what good entrepreneurs do in such situations, they went to court. Monistere sued Maxwell and state court Judge Jacob Karno in Gretna had to decide who had the rights to "Who Dat."

During the court proceedings, the Monistere side showed the judge a video of sportscaster Ron Swoboda at the recording session where a "Who Dat" song was made. He watched a video of the New Orleans City Council proclaiming "Who Dat Day." He heard a tape of a Marine band playing the song on the West Bank at a reception for then presidential candidate John Glenn. He was told of plans for a "Who Dat" beer and "Who Dat" orange drink and a seemingly endless line of "Who Dat" novelties.

Maxwell countered that the phrase was in the public domain and produced a 1981 magazine article about St. Augustine High School that said the "Who Dat" chant has been popular since the 1960s. Maxwell said he grew up hearing it and that it has been used at Louisiana State University. He claimed the phrase has been popular for decades in the 9th Ward.

Karno agreed with Maxwell but said the two could still sue



Sal, left, and Steve Monistere and Ellis Pailet with Saints paraphernalia.

STAFF PHOTO BY ELIOT KAMENITZ

## ▶ Follow-up

each other for damages and that one side could establish what is known as a "secondary meaning" for the phrase.

A month later, NFL Properties Inc., the franchising company owned by the 28 members of the National Football League, awarded Who Dat Inc. exclusive franchising rights to the phrase. "We established our secondary meaning to the phrase," said Ellis Pailet, Monistere's lawyer.

Around the same time, Maxwell got an NFL Properties franchise that allowed his company to produce more traditional Saints products.

With the Saints in the playoffs, both entrepreneurs say they are happy.

Monistere in 1984 moved to San Antonio and runs Who Dat Inc. with his brother. Nuccio, a musician, sold his interest and moved to Los Angeles.

"Everyone thinks we are making a killing," Monistere said. "We still work hard. We have a lot expenses. We aren't making a killing."

Maxwell said he is producing 1,200 Saints T-shirts an hour at

his Kenner plant but none of them have "Who Dat" on them.

Monistere's current "Who Dat" projects, for which he receives royalties, include "Who Dat" champagne marketed by Martin Wine Celler, jewelry marketed by Aucoin-Hart and Sue's in Metairie; a new record featuring Aaron Neville, a "Who Dat" Christmas song featuring a group of Texas children, and all the T-shirts, lighters, buttons, pennants, flash cards, license plates that it takes to cheer the team to the playoffs.



COMPARE MORTGAGE RATES

GLOBE HOMESTEAD ASSOCIATION

"Your Money Is Safe"

529-1504

40.  Without the hard work and investments in time, energy, and money put forth, the phrase would not have gained the recognition it enjoys today.

41.  Despite the publicity associated with the legal battle over ownership of ōWHO DATö and the determinations made for Who Dat?, Inc., on April 8, 1988 the Saints inexplicably registered (without disclosing same to Who Dat?, Inc.) for a ōWHO DATö trademark. The Saints clearly were trying to a) capitalize on the goodwill created by Who Dat?, Inc.ös expenditure of time, effort, and money and b) cause confusion or mistake or to deceive the general public.

42.  Months later, the Saints wanted Who Dat?, Inc. to play a key role in creating a ōWho Dat! Fan Clubö for the upcoming season.  Who Dat?, Inc. executed an agreement with the Saints and a fan club was launched with life memberships for WHO DATs everywhere as indicated in this excerpt from the 1988 Training Camp program (attached as Exhibit ōIö):



**NEW ORLEANS LOUISIANA SAINTS**

Vol. 20, No. 3                                    TRAINING CAMP, 1988

**IN THIS ISSUE**
- Season Ticket Record
- Summer Calendar
- LaCrosse Awaits

# Who Dat! Fan Club New for '88

Unifying all Saints fans under one banner, the Saints Official Who Dat! Fan Club will conduct its charter membership drive through August at area locations of four major businesses: Time Saver, McDonald's, TicketMaster and Benson auto dealerships.

The club takes its name from the distinct cheer that has become identified as the battle cry of the diehard Saints fan: ''Who Dat Say Dey Gonna Beat Dem Saints? Who Dat! Who Dat!!''

''There's nothing like it that I know of in our league,'' Saints president Jim Finks said of the Who Dat! phenomenon. ''The words 'Saints Fan' and 'Who Dat!' have become interchangeable. Last year everyone around the country came to understand that loyal Saints followers,

not just the people who come to the games, are Who Dats!

''Besides its unique quality, I like the fact that Who Dat! is a fun thing. Our fans like to have fun.''

The new club carries a one-time, lifetime membership fee of $12. Fans who join prior to the start of the Saints 1988 season will receive a special charter member designation.

With their membership, fans receive an official membership certificate and an official membership card that will hold several benefits in the exciting months to come. In addition, those who join receive a membership kit that features a lapel pin, key fob, badge, bumper sticker and mini pennant — all available only to members of the club.

Time Saver, McDonald's, TicketMaster and Benson Automotive World have been designated as Saints Who Dat! fan headquarters for the charter membership drive. Membership applications will be available at all locations of Time Saver, McDonald's, TicketMaster and Benson auto dealerships.

In addition, applications will be available at the Saints' Superdome ticket office.

Archie Manning, former Saints quarterback, has agreed to serve as national president and head a board of directors that includes Pete Fountain, Angela Hill, Aaron Neville, Ron Swoboda, Rich Mauti, Danny Abramowicz, Marie Knutson, Frank Davis.

(continued on page 6)



**SAINTS YEARBOOK AVAILABLE SOON**

Commemorative of the Saints first winning season and first playoff year, the Saints Official Yearbook will roll off the presses in July and be available exclusively at all Shoetown locations beginning July 29.

The 92-page, four-color collectible publication will be the focus of a special Saints-Shoetown promotion through which the book will be offered at a special price.

Beginning in September, the yearbook will be available on newstands for the full $5 cover price.

In addition to feature stories on Tom Benson, Jim Finks and Jim Mora, the yearbook takes an in-depth look at the team's three units: offense, defense and special teams. A look back at 1987 and a look ahead to 1988 are among the stories developed and written by an impressive lineup of area journalists.

This is the first official yearbook published for the team since the early days of the franchise. The special souvenir edition is produced by the Sports Publishing Group and the New Orleans Saints.

43. As part of the agreement with the Saints to create the fan club, the Saints agreed to transfer, assign, and convey to Who Dat?, Inc. whatever right, title and interest whatsoever that the Saints had or claimed to have had in the trademark "WHO DAT!", including the aforementioned Saints April 8, 1988 registration.   Moreover, the Saints specifically identified and recognized Who Dat?, Inc. as the first user of "WHO DAT" or any derivations thereof. Finally, the Saints acknowledged that as the first user, Who Dat?, Inc. had exclusive right to use the mark.  All of this is set forth in the following Transfer, Assignment Conveyance (attached as Exhibit "J"):



TRANSFER, ASSIGNMENT & CONVEYANCE

Whereas NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP has registered the mark WHO DAT! in the Louisiana State Trademark Office; and

Whereas NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP does hereby assign, convey and transfer for valuable consideration whatever right, title and interest whatsover that NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP, has or claims to have in the trademark WHO DAT!, to WHO DAT?, INC.; and, that WHO DAT?, INC. has through first use of the mark(s), WHO DAT!, WHO DAT? or any of its derivations acquired exclusive right to use said mark(s) and said NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP, does so acknowledge this fact.

NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP

BY: _____
Greg Suit, Director of Marketing

44. The Saints provided Who Dat?, Inc. with a copy of said Transfer, Assignment Conveyance with the following cover letter[1] (attached as Exhibit õKö) addressed to the Louisiana Secretary of Stateøs Office on September 2, 1988:

---

[1] Who Dat?, Inc. recently learned that although Plaintiff was provided a copy of this letter by the Saints at the time it was prepared, the letter mysteriously never made it to the Secretary of Stateøs Office and the attached Assignment therefore was never filed. That fact is particularly odd when one considers that the Saints never disclosed this to Who Dat?, Inc. and instead simply kept renewing the mark with the understanding that a third party looking at the registered marks could be deceived into believing that the Saints actually continue to own the mark.



**SAINTS**

September 2, 1988

Ms. Donna Rivere
Secretary of State's Office
Trademark Section
State of Louisiana
P. O. Box 44125
Baton Rouge, LA  70804

RE:  Who Dat ?, Inc.

Dear Ms. Rivere:

Enclosed please find a transfer, assignment and conveyance
of the Who Dat! mark that we have filed.  I authorize you to
transfer the registration we filed to the first usage party of
said phrase, Who Dat ?, Inc.

As the New Orleans Saints thru their official "Who Dat!
Saints Fan Club" have an interest in the fact that Who Dat?, Inc.
has filed registrations for the mark Who Dat or any other derivation
thereof, and has first use of said mark, we would appreciate if you
would not file any other Who Dat marks other than on behalf of
Who Dat?, Inc..  In addition, I would appreciate your canceling all
trademarks filed after Who Dat?, Inc. filed their trademarks in 1983.

Thank you for your kindness and consideration in this matter.

Very truly yours,

Greg Suit
Director of Marketing

45. In furtherance of the agreement between the Saints and Who Dat?, Inc. an

Agreement (attached as Exhibit öLö) was executed which begins as follows:

AGREEMENT

    THIS   AGREEMENT   between   WHO   DAT?,   INC.,   a   Louisiana corporation,   with   principal   place   of   business   at,   Suite   107,   818 Howard   Avenue,   New   Orleans,   La.   70113,   State   of   Louisiana,   herein called   the   Licensor,   and   SPORTS/CELEBRITY   INCENTIVES,   INC., individually,   and   on   behalf   of   the   New   Orleans   Louisiana   Saints Limited   Partnership,   with   a   mailing   address   at   1315   W.   22nd Street,   Suite   250,   Oak   Brook,   Illinois   60521,   herein   called   the Licensee.

46.   The Agreement is signed by the Saints on September 3, 1988 as follows:

    I   have   read   the   entire   agreement   hereinabove   written,   and acknowledge   and   agree   to   all   of   its   terms   and   conditions.

New   Orleans,   Louisiana   this   3rd   day   of   September,   1988.

    New   Orleans   Louisiana   Saints   Limited   Partnership

by [signature] Greg Suit

47.   Through their execution of this agreement, the Saints recognize and acknowledge the following:

    a.   *Who Dat?, Inc is "engaged in the business of marketing products and/or concepts based upon WHO DAT, WHO DAT?, WHO DAT! and/or derivative thereof*, and said name, has been trademarked and registeredö in Who Dat?, Inc.øs name;

    b.   *Who Dat?, Inc.'s territory is the United States* and any other territory or country deemed beneficial by the companies;

c. Sports/Celebrity Incentives, Inc. as an agent of the Saints agreed to defend Who Dat?, Inc.ʼs right, title and interest to the ōWHO DATö Trademarks;

d. The phrase ōWHO DATö or any of its derivations is unique and original and ***Who Dat?, Inc. is the owner*** thereof;

e. As a result of Who Dat?, Inc.ʼs ōexploitation of the WHO DAT name and/or character therein and otherwise, [Who Dat?, Inc.] ***has acquired a substantial and valuable goodwill*** thereinö;

f. As a result of Who Dat?, Inc.ʼs exploitation of the ōWHO DATö name and/or Character it ō***has acquired a secondary meaning***, and the Characters themselves have established a meaning distinct from any prototypes on which they may have been basedö;

g. Any ***trademarks "heretofore obtained by [Who Dat?, Inc.] or in connection with the WHO DAT name and/or Character are good and valid"***;

h. Sports/Celebrity Incentives, Inc. as an agent of the Saints ōwarrant the validityö of Who Dat?, Inc.ʼs trademarks;

i. Sports/Celebrity Incentives, Inc. as an agent of the Saints ***shall not at any time during or after the term of the agreement "dispute or contest, directly or indirectly Who Dat?, Inc.'s exclusive right and title to the name and/or character, or the validity of Who Dat?, Inc.'s" trademarks***, nor shall Sports/Celebrity Incentives, Inc. as an agent of the Saints assist or aid others in doing so;

j. Sports/Celebrity Incentives, Inc. as an agent of the Saints *shall cooperate with Who Dat?, Inc. in preventing any infringement of Who Dat?, Inc.'s trademarks*;

k. Who Dat?, Inc. öhas *the right, through first usage, to this registration*ö; and

l. The Saints ödo *hereby specifically assign, transfer and convey to [Who Dat?, Inc.], said registration* and will cause said registration to be assigned, transferred, and conveyed immediately.ö

48. Since clearly and unequivocally assigning, transferring and conveying ösaid registrationö to Who Dat?, Inc. the registration has been renewed twice and remains active and is not set to expire until April 8, 2018 as reflected in Book # 46-0535. The Saints are fully aware of the renewal as it was the Saints that applied for the renewal of the mark for Who Dat?, Inc. on March 31, 1998 and March 24, 2007 with both applications signed personally by Tom Benson as the öAuthorized Representative.ö

49. Who Dat?, Inc. has also undertaken efforts to obtain federal protection of its use of öWHO DATö. Filings were made in 1988, 1990, 1991, 1993, and 2010. Additionally, Who Dat?, Inc. opposed a filing made in 2002 for the öWho Dat? Blues Bandö. Who Dat?, Inc. successfully negotiated for the registrant to convey, transfer, and assign to Who Dat?, Inc. all right, title, and interest in the mark recognizing that Who Dat?, Inc. öhas continually used [the mark] around the United States since 1983.ö

50. The öWHO DATö Trademarks are famous to the public because of the widespread use of said marks, the great popularity of öWHO DATö Merchandise, and the extensive advertising and media coverage of the öWHO DATö Trademarks and brand. The öWHO DATö Trademarks embody substantial goodwill and have achieved fame and secondary meaning as

identifiers of Who Dat?, Inc. as the source or sponsor of goods and services upon which the "WHO DAT" Trademarks appear.  A great deal of merchandise has been sold under the "WHO DAT" Trademarks directly by Who Dat?, Inc. and by parties licensed by Who Dat?, Inc.  As a result, said trademarks became extremely valuable commercial assets and embody goodwill of substantial value.

### C. THE THEFT AND INFRINGEMENT OF "WHO DAT"

51.  On February 16, 2007 the Saints inexplicably disputed or contested, directly or indirectly Who Dat?, Inc.'s exclusive right and title to the name and/or character, or the validity of Who Dat?, Inc.'s trademarks.  The Saints did this in their application for a "WHO DAT" Trademark through the Louisiana Secretary of State's Office at Book Number 59-5077.  In that application, also signed by Tom Benson, the Saints assert that they were the first to use the "WHO DAT" mark and that they began doing so on November 1, 1983, which, of course, could not be further from the truth.

52.  Similarly, on February 1, 2006 the Saints and NFLP filed a Notice of Opposition in the United States Patent and Trademark Office in the matter of Application Serial No 76/619,018 with respect to a "WHO DAT" mark applied for by a third party in 2004.  Therein, both the NFLP and the Saints claimed as follows:

    a.  They have used "WHO DAT" since 1983;

    b.  They "have used the trademark WHO DAT and variations thereof" for many years long before November 1, 2004 in connection with their business of organizing, conducting and promoting the Saints;

   c. They have used the trademark ōWHO DATö and variations thereof in connection with the sale of a wide variety of goods and services for many years long before November 1, 2004;

   d. They and their licensees and sponsors have sold, and offered for sale, goods and services bearing the trademark ōWHO DATö and variations thereof in a trading area of broad geographical scope encompassing, <u>inter alia</u>, all of the states and territories of the United States;

   e. They and their licensees and sponsors have sold, and offered for sale goods and services bearing the trademark ōWHO DATö and variations thereof in numerous channels of trade; and

   f. The true owners of the trademark ōWHO DATö and variations thereof would be damaged when others register for and/or use the trademark ōWHO DATö and variations thereof without authorization as such registration and/or use will cause confusion and will give color of exclusive statutory rights to the applicants in violation and derogation of the prior and superior rights of the true owners.

53. Upon information and belief, the Saints and NFLP entered into licensing agreements with Reebok International Ltd. and others to use the ōWHO DATö Trademarks and reap the benefits of Who Dat?, Inc.øs goodwill, and the Saints and NFLP profited from these agreements.

54. Who Dat?, Inc., unaware of these actions and representations, approached the Saints in September of 2009 about jointly working on some projects through a mutually beneficial licensing arrangement similar to the previous contractual arrangements outlined above.

55. Instead of confessing the actions recently taken adverse to the interests of Who Dat?, Inc., the Saints and NFLP tried to grind out the clock on the football season by taking their time

to respond to correspondence and then giving excuses about one person or another being out of the office.

56.  In one response to Who Dat?, Inc., a representative from the NFLP stated that the NFLP and Saints would not accept a license from Who Dat?, Inc. for the use of the "WHO DAT" Trademarks, but rather would consider an arrangement whereby Who Dat?, Inc. assign any and all interests in the "WHO DAT" Trademarks to the Saints, and then the NFLP and Saints would license back some of those rights in some capacity.   Thus, Who Dat?, Inc. was propositioned by the Saints and NFLP to sell the trademarks Who Dat?, Inc. had developed. However, attempts to negotiate a price were not successful.

57.  Shortly thereafter, the NFLP individually and on behalf of the Saints started sending out cease and desist letters wherein they claimed that they "are the owners of several federal and state trademark registrations" that include the "WHO DAT word marks."

58.  Around the same time, the Saints applied for use of "WHO DAT" in Florida so it could, and upon information and belief did, sell "WHO DAT" Merchandise in connection with the Super Bowl.  That filing is identified by Document Number T10000000072 through the Florida Department of State, Division of Corporations.  Again, with the signature of Tom Benson (which happens to be notarized by the Saints own attorney, Vicky Neumeyer, who was involved in the discussions regarding the Saints potential acquisition of "WHO DAT" only weeks earlier), the Saints claim that they "own and use in interstate commerce, including the State of Florida, the WHO DAT mark."  And now they contend that they first used the mark on May 1, 1988 (which happens to be the month after their first registration for the mark – the registration they later that year assigned to Who Dat?, Inc. as the proper owner and first user of the mark and "any of its derivations").

59. When challenged publically on these false assertions, the Saints and NFLP conceded that they do not own the ō WHO DAT ö marks.  But instead of stopping there, Bryan McCarthy speaking on behalf of NFL Properties happily went a step further and stated that ō people can use WHO DAT all they want if it doesnọt include NFL and Saints trademarks.ö  Taking their cue, elected officials for the State of Louisiana declared ō victoryö over the oppressive NFLP and the Saints and have repeatedly declared that the phrase belongs to the people and is in the public domain.  For example, Attorney General James D. ō Buddyö Caldwell has a ō news releaseö on the front page of the Office of the Attorney Generalọs website wherein he states that ō WHO DAT and the fleur-de-lis are public domain.ö

60. Recently, the Saints themselves have publically admitted that they do not own any rights in the ō WHO DATö mark and that said mark belongs to the people of WHO DAT NATION.

## D.  THE DREAM BECAME A NIGHTMARE

61.  The public statements of the Defendants concerning ownership of ō WHO DATö and unauthorized used of ō WHO DATö Trademarks have caused a great deal of confusion among the public.  Registrations for ō WHO DATö related marks have exploded.  In the three months from November 12, 2009 through February 12, 2010 there were 39 filings locally and federally.  In all the years prior there were not that many combined filings made by entities other than Who Dat?, Inc. and the Saints.

62.  As a natural consequence of this confusion, individuals and companies that would otherwise have entered into license agreements with Who Dat?, Inc. for use of ō WHO DATö began using the mark without Who Dat?, Inc.ọs authorization as is evidenced by the following excerpts of a letter (attached as Exhibit ō Mö) from The Coca-Cola Company:

*The Coca-Cola Company*

COCA-COLA PLAZA
ATLANTA, GEORGIA

Livingstone Johnson
Executive Counsel
Office of The General Counsel
404 676-3511

ADDRESS REPLY TO
P. O. DRAWER 1734
ATLANTA, GA 30301
404 676-2121

February 11, 2010

During our research of this matter, it was brought to our attention that there are several third party claims/uses of the wording WHO DAT, both in common law and on the USPTO registry.  In addition, at various times at the USPTO, NFL Properties LLC has claimed rights to WHO DAT.  Further, according to recent news articles, the NFL has sought to restrict third party uses of WHO DAT when the wording is coupled with the Saints' colors or other insignia.

At present, it is unclear who has superior rights (and to what extent) but nonetheless, we will continue our diligence to ensure that we are not infringing any rights.  We await additional details from you and look forward to resolving this matter amicably.

63.   Moreover, merchandise of inferior quality has flooded the marketplace and made it impractical for companies with properly licensed merchandise to compete for sales.

64.   As demonstrated above, the Saints and NFLP have been acutely aware of the existence of Who Dat?, Inc. and the value of the "WHO DAT" Trademarks.  The Saints and NFLP and their agents were licensees and sales representatives for certain "WHO DAT" Merchandise.  The Saints and NFLP have seized upon their awareness to exploit Who Dat?, Inc.'s fame and goodwill through merchandising programs and the sale of unauthorized "WHO DAT" products.  The Saints and NFLP have advertised and sold, without Who Dat?, Inc.'s knowledge and consent, in interstate commerce merchandise, including shirts and hats, bearing the "WHO DAT" Trademarks.  By way of example, the following image (attached as Exhibit "N") reflects a "WHO DAT" hat available for sale on the Saints' and NFLP's website in

December of 2009:



65.   Perhaps just as telling, despite the fact that õWHO DATö was the third most searched term on the internet after the Saints won the Super Bowl, and despite the fact that officials for the State of Louisiana have repeatedly stated that õWHO DATö is in the public domain, the Saints and NFLP no longer have a single õWHO DATö item for sale on their website.

66.   Who Dat?, Inc. has recently issued cease and desist letter to several local companies and to the NFLP and Saints for the unauthorized manufacture and distribution of õWHO DATö Merchandise.   However, there is no escaping the reality that the Saints and NFLP successfully played their cards to make sure that if they were not going to profit from the success of õWHO DATö then nobody would despite the fact that the mark has become one of the most recognizable in all of America and quickly became well-known around the world.

## VI.    COUNT 1: REQUEST FOR DECLARATORY RELIEF

67.  Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-66 of this Complaint.

68.  Pleading further, Who Dat?, Inc. seeks on behalf of itself a declaration of the Court, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., that:

a.  Who Dat?, Inc. was the first to use "WHO DAT" in a commercial context;

b.  Who Dat?, Inc. first used "WHO DAT" in October of 1983;

c.  Who Dat?, Inc. first trademarked the phrase "WHO DAT" in 1983;

d.  In 1983 Who Dat?, Inc. acquired exclusive right to use "WHO DAT" or any of its derivations;

e.  Who Dat?, Inc. obtained several trademarks for the phrase "WHO DAT" and variations thereof (the "WHO DAT" Trademarks);

f.  In September of 1988 the Saints transferred to Who Dat?, Inc. whatever right, title, and interest whatsoever that the Saints had or claimed to have in the "WHO DAT" trademark;

g.  Sports/Celebrity Incentives, Inc. as an agent of the Saints agreed to defend Who Dat?, Inc.'s right, title and interest to the "WHO DAT" Trademarks;

h.  As a result of the exploitation of the "WHO DAT" name and/or character therein and otherwise, Who Dat?, Inc. has acquired a substantial and valuable goodwill therein;

i.  The "WHO DAT" name and/or Character is inherently distinctive or has acquired a secondary meaning, and the Characters themselves have established a meaning distinct from any prototypes on which they may have been based;

j. On one or more occasions after September 3, 1988 the Saints disputed or contested, directly or indirectly, Who Dat?, Inc.'s exclusive right and title to the name and/or character, or the validity of Who Dat?, Inc.'s trademarks;

k. On one or more occasions after September 3, 1988 the Saints have assisted or aided others in disputing or contesting, directly or indirectly, Who Dat?, Inc.'s exclusive right and title to the name and/or character, or the validity of Who Dat?, Inc.'s trademarks;

l. Who Dat?, Inc. has the right, through first usage, to the Saints' registration filed in 1988;

m. Who Dat?, Inc. has the right, through first usage, to the Saints' registration filed on 2/16/07;

n. The Saints assigned, transferred and conveyed to Who Dat?, Inc., the Saints' 1988 registration of the "WHO DAT" trademark;

o. Who Dat?, Inc. never abandoned the "WHO DAT" Trademarks;

p. Who Dat?, Inc. continuously used "WHO DAT" since 1983;

q. The phrase "WHO DAT" or any of its derivations is unique and original and Who Dat?, Inc. is the owner thereof;

r. The phrase "WHO DAT" is not in the public domain;

s. Who Dat?, Inc.'s territory is the world; and

t. Defendant's acts and practices have directly and proximately caused damages to Who Dat?, Inc.

69. Who Dat?, Inc. also respectfully requests that this Court award its reasonable and necessary attorney fees under 28 U.S.C. §§ 2201, et seq.

## VII.   COUNT 2: CANCELLATION

70. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-69 of this Complaint.

71. As set forth above, on and after February 16, 2007 the Saints have applied for several trademarks for ōWHO DATö and variations thereof.  Those applications have been filed both in and out of the State of Louisiana.

72. Each registration obtained based on those applications was obtained fraudulently.

73. In connection with each of those applications, the Saints have misrepresented themselves as the owner of the mark (which they obviously are not) and they fraudulently misrepresented their first use date.

74. Pursuant to the Louisiana Revised Statutes, the Court shall order that the Louisiana Secretary of State cancel each registration obtained for ōWHO DATö and variations thereof obtained by the Saints on or after February 16, 2007.

75. Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## VIII.   COUNT 3: FRAUDULENT REGISTRATION

76. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-75 of this Complaint.

77. As set forth above, in 1988 the Saints specifically acknowledged and represented as follows:

    a. In September of that year the Saints assigned, transferred and conveyed to Who Dat?, Inc. whatever right, title, and interest whatsoever that the Saints had or claimed to have in the ōWHO DATö trademark;

b. Who Dat?, Inc. has exclusive right and title to the name and/or character, or the validity of the ōWHO DATö trademark and all derivations thereof;

c. They would not assist or aid others in disputing or contesting, directly or indirectly, Who Dat?, Inc.øs exclusive right and title to the name and/or character, or the validity of the ōWHO DATö trademark and all derivations thereof;

d. Who Dat?, Inc. has the right, through first usage, to the Saintsø registration filed in 1988;

e. The phrase ōWHO DATö or any of its derivations is unique and original and Who Dat?, Inc. is the owner thereof;

f. As a result of Who Dat?, Inc.øs exploitation of the ōWHO DATö name and/or character therein and otherwise, Who Dat?, Inc. has acquired a substantial and valuable goodwill therein;

g. As a result of Who Dat?, Inc.øs exploitation of the ōWHO DATö name and/or Character it has acquired a secondary meaning, and the Characters themselves have established a meaning distinct from any prototypes on which they may have been basedö;

h. The phrase ōWHO DATö is not in the public domain; and

i. Who Dat?, Inc.øs territory for the ōWHO DATö trademark and all derivations thereof is the United States.

78. Despite these acknowledgements and representations, on and after February 16, 2007 the Saints have registered for several trademarks for ōWHO DATö and variations thereof.  Those registrations have been filed both in and out of the State of Louisiana and therein the Saints represented as follows:

a. The Saints never assigned, transferred and conveyed to Who Dat?, Inc. whatever right, title, and interest whatsoever that the Saints had or claimed to have in the õWHO DATö trademark;

b. Who Dat?, Inc. does not have exclusive right and title to the name and/or character, or the validity of the õWHO DATö trademark and all derivations thereof;

c. They are disputing or contesting, directly or indirectly, Who Dat?, Inc.øs exclusive right and title to the name and/or character, or the validity of the õWHO DATö trademark and all derivations thereof;

d. Who Dat?, Inc. does not have the right, through first usage, to the Saintsø registration filed in 1988;

e. The phrase õWHO DATö or any of its derivations is not unique and original and Who Dat?, Inc. is not the owner thereof;

f. Despite Who Dat?, Inc.øs exploitation of the õWHO DATö name and/or character therein and otherwise, Who Dat?, Inc. has not acquired a substantial and valuable goodwill therein;

g. Despite Who Dat?, Inc.øs exploitation of the õWHO DATö name and/or Character it has not acquired a secondary meaning, and the Characters themselves have not established a meaning distinct from any prototypes on which they may have been basedö;

h. The phrase õWHO DATö is in the public domain; and

i. Who Dat?, Inc. does not have a territory for the õWHO DATö trademark and all derivations thereof.

79. In an effort to conceal their wrongdoing, the Saints did not provide Who Dat?, Inc. a copy of any of these registrations.

80. Subsequent to the filing of these registrations, the Saints have publically admitted that they do not own any rights in the õWHO DATö mark and that said mark belongs to the people of WHO DAT NATION.

81. As shown above, the Saints have for themselves procured the filing or registration of marks in the office of the Secretary of State under the provisions of the Louisiana Revised Statutes, by knowingly making false or fraudulent representations or declarations.

82. The Saintsø acts and practices as set forth herein have directly and proximately caused damages to Who Dat?, Inc.

83.     Pursuant to Chapter 51, Section 221 of the Louisiana Revised Statutes, the Saints are liable to pay all damages sustained in consequence of such filings or registrations, to be recovered by or on behalf of Who Dat?, Inc. in any court of competent jurisdiction.

84. Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## IX.     COUNT 4: REQUEST FOR PERMANENT INJUNCTION

85. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-84 of this Complaint.

86. Who Dat?, Inc. requests injunctive relief to prevent Defendants from taking action to destroy or otherwise damage the value of Who Dat?, Inc.øs interests in the õWHO DATö marks. Additionally, Who Dat?, Inc. fears that the Saints and the NFLP may destroy, remove or secret documents and other information related to the issues and causes of action in an attempt to conceal crucial evidence of their illegal conduct.

87. If the Saints and the NFLP succeed in these efforts, Who Dat?, Inc. will suffer immediate and irreparable harm in that (a) any remaining value in the "WHO DAT" marks will be lost; (b) any remaining credibility and goodwill of Who Dat?, Inc. will be lost; and (c) documentation relating to the claims asserted herein will be destroyed.

88. If the Saints and the NFLP succeed in these efforts, there is a strong likelihood of injury to Who Dat?, Inc.'s business reputation or of dilution of the distinctive quality of the "WHO DAT" mark.  Such is grounds for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

89. The Saints and the NFLP's conduct has caused injury to the business reputation of Who Dat?, Inc. and dilution of the distinctive quality of the mark, and will likely cause further injury and dilution.

90. As set forth above, Who Dat?, Inc. has shown a probable right of recovery and likelihood of success on the merits on its claims against the Defendants and that Who Dat?, Inc. will suffer imminent, irreparable harm without Court intervention, for which there is no adequate remedy at law.

91. It is because Who Dat?, Inc. finds itself in this perilous position that it seeks extraordinary relief from the Court to immediately restrain the Defendants from engaging in the illegal conduct described above.  In order to preserve the status quo and to prevent imminent and irreparable harm to Who Dat?, Inc.'s vested rights, Who Dat?, Inc. respectfully urges the Court to grant an immediate Temporary Restraining Order and Injunctive Relief pursuant to Fed. R. Civ. P. 65.

92. Who Dat?, Inc. asks the Court to order the Defendants and their agents, servants, employees, independent contractors, attorneys, representatives, affiliates, parents, owners and those persons or entities in active concert or participation with them (collectively, the "Restrained Parties") as follows:

    a. Enjoin the Restrained Parties from declaring that the phrase ̃WHO DAT ̈ is in the public domain;

    b. Enjoin the Restrained Parties from sending cease and desist letters to individuals and entities using the ̃WHO DAT ̈ marks;

    c. Enjoin the Restrained Parties from instructing individuals and entities using the ̃WHO DAT ̈ marks to cease using same;

    d. Enjoin the Restrained Parties from interfering with or thwarting the ̃WHO DAT ̈ marks by refusing to act in good faith with respect to the ̃WHO DAT ̈ marks;

    e. Enjoin the Restrained Parties from further engaging in manipulative business strategies designed to interfere with Who Dat?, Inc.̓s business relations, disparage Who Dat?, Inc.̓s economic interests, and damage Who Dat?, Inc.̓s ability to negotiate with others to use the ̃WHO DAT ̈ Trademarks;

    f. Enjoin the Restrained Parties from taking any action or making any statements that are adverse to Who Dat?, Inc.̓s interests in the ̃WHO DAT ̈ Trademarks;

    g. Enjoin the Restrained Parties from destroying, removing, or secreting documents, records and other information related to the claims and allegations set forth in this lawsuit;

    h. Enjoin the Restrained Parties from denying that in September of 1988 the Saints assigned, transferred and conveyed to Who Dat?, Inc. whatever right, title, and

interest whatsoever that the Saints had or claimed to have in the "WHO DAT" trademark;

i.  Enjoin the Restrained Parties from denying that Who Dat?, Inc. has exclusive right and title to the name and/or character, or the validity of the "WHO DAT" trademark and all derivations thereof;

j.  Enjoin the Restrained Parties from assisting or aiding others in disputing or contesting, directly or indirectly, Who Dat?, Inc.'s exclusive right and title to the name and/or character, or the validity of the "WHO DAT" trademark and all derivations thereof;

k.  Enjoin the Restrained Parties from denying that Who Dat?, Inc. has the right, through first usage, to the Saints' registration filed in 1988;

l.  Enjoin the Restrained Parties from denying that the phrase "WHO DAT" or any of its derivations is unique and original and Who Dat?, Inc. is the owner thereof;

m. Enjoin the Restrained Parties from denying that as a result of Who Dat?, Inc.'s exploitation of the "WHO DAT" name and/or character therein and otherwise, Who Dat?, Inc. has acquired a substantial and valuable goodwill therein;

n.  Enjoin the Restrained Parties from denying that as a result of Who Dat?, Inc.'s exploitation of the "WHO DAT" name and/or Character is inherently distinctive or it has acquired a secondary meaning, and the Characters themselves have established a meaning distinct from any prototypes on which they may have been based";

o.  Enjoin the Restrained Parties from denying that Who Dat?, Inc.'s territory for the "WHO DAT" trademark and all derivations thereof includes the United States;

p. Enjoin the Restrained Parties from using on or in connection with the production, manufacture, advertisement, promotion, displaying for sale, offering for sale, sale, or distribution of any articles of merchandise, or for any purposes whatsoever, the ōWHO DATö Trademarks or any colorable imitations thereof;

q. Enjoin the Restrained Parties from using in connection with the production, manufacture, advertisement, promotion, displaying for sale, offering for sale, sale or distribution of any articles of merchandise, any combination of identifying designations of the Who Dat?, Inc. or any colorable imitations of any of the above;

r. Enjoin the Restrained Parties from representing by any means whatsoever, directly or indirectly, or doing any other acts or things calculated or likely to cause confusion, mistake or to deceive purchasers into believing that Restrained Parties products originated with or are the products of Who Dat?, Inc., or that there is any affiliation or connection between Who Dat?, Inc. and the Restrained Parties or their products and from otherwise unfairly competing with Who Dat?, Inc.; and

s. Enjoin the Restrained Parties from using any mark in a manner so as to cause the dilution of the distinctive quality of the famous ōWHO DATö Trademarks.

93. The requested temporary restraining order and request for injunctive relief will allow the maintenance of the last, actual, peaceable, and uncontested status quo.

94. Who Dat?, Inc. hereby requests the Court, upon further hearing, to find that Who Dat?, Inc. is entitled to receive a transfer of the 1988 registration by the Saints and that the Court should order the 1988 registration to be transferred by the Secretary of State of Louisiana to effect such transfer.

95. Who Dat?, Inc. requests the Court to enter an order that the NFLP and the Saints never again register for a ōWHO DATö mark or any derivation thereof.

96. Who Dat?, Inc. requests that no bond be required to be posted considering that the Defendants have all publically disavowed any ownership in the ōWHO DATö marks by claiming that ōWHO DATö is in the public domain.

## X.    COUNT 5: BREACH OF CONTRACT

97. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-96 of this Complaint.

98. As set forth above, the Saints entered into a contract with Who Dat?, Inc. in 1988. Pursuant to the terms of that contract, Who Dat?, Inc. paid valuable consideration to the Saints and in return the Saints represented and warranted that they would do the following:

a. Recognize that Who Dat?, Inc. is engaged in the business of marketing products and/or concepts based upon ōWHO DATö and/or derivatives thereof, and said name, has been trademarked and registered in Who Dat?, Inc.øs name;

b. Recognize that Who Dat?, Inc.øs territory is the United States and any other territory or country deemed beneficial by the companies;

c. Direct one of their agents to defend Who Dat?, Inc.øs right, title and interest to the ōWHO DATö Trademarks;

d. Recognize that the phrase ōWHO DATö or any of its derivations is unique and original and Who Dat?, Inc. is the owner thereof;

e. Recognize that as a result of Who Dat?, Inc.øs exploitation of the ōWHO DATö name and/or character therein and otherwise, Who Dat?, Inc. has acquired a substantial and valuable goodwill therein;

f.  Recognize that as a result of Who Dat?, Inc.¢s exploitation of the ōWHO DATö name and/or Character it has acquired a secondary meaning, and the Characters themselves have established a meaning distinct from any prototypes on which they may have been based;

g.  Recognize that any trademarks heretofore obtained by Who Dat?, Inc. or in connection with the ōWHO DATö name and/or Character are good and valid;

h.  Direct one of their agents to warrant the validity of Who Dat?, Inc.¢s trademarks;

i.  Refrain from disputing or contesting, directly or indirectly, Who Dat?, Inc.¢s exclusive right and title to the name and/or character, or the validity of Who Dat?, Inc.¢s trademarks;

j.  Refrain from aiding third parties in disputing or contesting, directly or indirectly, Who Dat?, Inc.¢s exclusive right and title to the name and/or character, or the validity of Who Dat?, Inc.¢s trademarks;

k.  Cooperate with Who Dat?, Inc. in preventing any infringement of Who Dat?, Inc.¢s Trademarks;

l.  Recognize that Who Dat?, Inc. has the right, through first usage, to the ōWHO DATö registration; and

m. Assign, transfer and convey to [Who Dat?, Inc.], the ōWHO DATö registration obtained in 1988.

99.  The Saints and Who Dat?, Inc. had capacity and consent to enter into this lawful cause for a lawful object.

100. Despite these acknowledgements and representations, on and after February 16, 2007 the Saints have registered for several trademarks for ōWHO DATö and variations thereof.

Those registrations have been filed both in and out of the State of Louisiana.  Through these registrations, the Saints have breached their contractual agreement with Who Dat, Inc. as follows:

    a.  They specifically and/or impliedly represented that they do not recognize that Who Dat?, Inc. is engaged in the business of marketing products and/or concepts based upon ōWHO DATö and/or derivatives thereof, and said name, has been trademarked and registered in Who Dat?, Inc.øs name;

    b.  They specifically and/or impliedly represented that they do not recognize that Who Dat?, Inc.øs territory is the United States and any other territory or country deemed beneficial by the companies;

    c.  They have not defended Who Dat?, Inc.øs right, title and interest to the ōWHO DATö Trademarks;

    d.  They specifically and/or impliedly represented that they do not recognize that the phrase ōWHO DATö or any of its derivations is unique and original and Who Dat?, Inc. is the owner thereof;

    e.  They specifically and/or impliedly represented that they do not recognize that as a result of Who Dat?, Inc.øs exploitation of the ōWHO DATö name and/or character therein and otherwise, Who Dat?, Inc. has acquired a substantial and valuable goodwill therein;

    f.  They specifically and/or impliedly represented that they do not recognize that as a result of Who Dat?, Inc.øs exploitation of the ōWHO DATö name and/or Character it has acquired a secondary meaning, and the Characters themselves

have established a meaning distinct from any prototypes on which they may have been based;

g.  They specifically and/or impliedly represented that they do not recognize that any trademarks heretofore obtained by Who Dat?, Inc. or in connection with the "WHO DAT" name and/or Character are good and valid;

h.  They have not warranted the validity of Who Dat?, Inc.'s trademarks;

i.  They did not refrain from disputing or contesting, directly or indirectly, Who Dat?, Inc.'s exclusive right and title to the name and/or character, or the validity of Who Dat?, Inc.'s trademarks;

j.  They did not refrain from aiding third parties in disputing or contesting, directly or indirectly, Who Dat?, Inc.'s exclusive right and title to the name and/or character, or the validity of Who Dat?, Inc.'s trademarks;

k.  They did not cooperate with Who Dat?, Inc. in preventing any infringement of Who Dat?, Inc.'s Trademarks; and

l.  They specifically and/or impliedly represented that they do not recognize that Who Dat?, Inc. has the right, through first usage, to the "WHO DAT" registration.

101.   Additionally, the Saints breached their agreement by not filing with the Secretary of State of Louisiana the document assigning, transferring and conveying to Who Dat?, Inc., the "WHO DAT" registration obtained in 1988.

102.   Additionally, the Saints have recently breached their contractual agreement with Who Dat, Inc. by representing (individually and through the NFLP as their agent) to individuals, entities, and the general public that the Saints and/or the NFLP own the "WHO DAT" marks.

103.    Additionally, the Saints have recently breached their contractual agreement with Who Dat, Inc. by representing (individually and through the NFLP as their agent) to individuals, entities, and the general public that nobody owns the õWHO DATö marks and the people are free to use that phrase as it is in the public domain.

104.    As a natural consequence of these breaches by the Saints, Who Dat?, Inc. suffered damages for which it seeks compensation in addition to the specific performance of the Saints.

105.    Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## XI.    COUNT 6: TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

106.    Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-105 of this Complaint.

107.    As detailed above, Who Dat?, Inc. entered into numerous contracts with individuals and entities with respect to delivering õWHO DATö Merchandise to the marketplace throughout the United States and around the world.  Who Dat?, Inc. stood to obtain a significant financial benefit from those contracts over time.

108.    The Saints and NFLP and State of Louisiana, as shown above, were aware of these contractual relations.  Indeed, the Saints and NFLP even tried to purchase the rights to the õWHO DATö marks only a few months ago.

109.    The Saints and NFLP and State of Louisiana through the actions set out above (and specifically through their public declarations that õWHO DATö is in the public domain and can be used by anyone without license or authorization by anyone) intentionally induced the contracting parties to break their contracts with Who Dat?, Inc.

110.    The Saints and NFLP and State of Louisiana have no viable justification for their conduct.

111.    As a result of that conduct, the subject contracts have been broken, thereby causing Who Dat?, Inc. damage.

112.    Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

XII.    **COUNT 7: DECEPTIVE ADVERTISING UNDER LOUISIANA LAW**

113.    Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-112 of this Complaint.As set forth above, the Saints, the NFLP, and the State of Louisiana made misleading or false factual representations of the quality or nature of Who Dat?, Inc.øs goods or services and the misleading or false representations was used õin commerceö or in regard to any service.

114.    The Saints, the NFLP, and the State of Louisiana made the false or misleading statement in a õcommercial advertising or publicationö to promote the goods or service or otherwise further their own interests.

115.    Who Dat?, Inc. reasonably believed it was likely to suffer and in fact did suffer damages from the false or misleading representations.

116.    The aforesaid acts of Defendants have caused and are causing great and irreparable harm and damage to Who Dat?, Inc., and unless preliminarily and permanently restrained by this Court, said irreparable injury will continue.

117.    Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

### XIII.   COUNT 8: TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT

118.    Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-117 of this Complaint.

119.    Who Dat?, Inc. began use of the õWHO DATö Trademarks on or about 1983 as a trademark for goods and services.

120.    The Saints and the NFLP began to use the mark after that date in an area where Who Dat?, Inc. was selling or distributed its goods.  The Saints and the NFLP use of the mark was without the consent of Who Dat?, Inc.

121.    The õWHO DATö Trademarks are inherently distinctive and/or have acquired secondary meaning.

122.    As set forth above, the Saints and the NFLP have used in interstate and intrastate commerce õWHO DATö on or in connection with goods or services and said use:

    a.  is likely to cause confusion, or to cause mistake, or to deceive, or

    b.  misrepresents the nature, characteristics, qualities, or geographic origin of their goods, services, or commercial activities.

123. The unauthorized use of õWHO DATö by the Saints and NFLP has caused public confusion as to ownership, association, sponsorship or affiliation, and the NFLP and Saints intended to cause this confusion by engaging in the activities described above.

124. The Saints and the NFLP use of õWHO DATö destroys or interferes with Who Dat?, Inc.øs exclusive right to use that mark for goods or services.

125.    The threat of the loss of Who Dat?, Inc.øs right to control the use of õWHO DATö and the reputation of its goods and/or services is real and substantial.

126.   The Saints and the NFLP acts described herein have injured, or likely will injure, Who Dat?, Inc.¢s business, reputation, and good will, and unless enjoined will continue to do so, all to Who Dat?, Inc.¢s irreparable harm.

127.   The Saints and the NFLP unauthorized use of Who Dat?, Inc.¢s distinctive mark constitutes trademark infringement in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## XIV.   COUNT 9: STATE STATUTORY TRADEMARK INFRINGEMENT AND DILUTION

128. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-127 of this Complaint.

129. As set out above, the Saints and the NFLP have used, without the consent of Who Dat?, Inc., reproductions, counterfeits, copies, or colorable imitations of the õWHO DATö Trademarks (registered Who Dat?, Inc.) in connection with the sale, offering for sale, or advertising of goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services.

130. As set out above, the Saints and the NFLP have reproduced, counterfeited, copied or colorably imitated the õWHO DATö Trademarks and have applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used upon or in conjunction with the sale or other distribution in this State of such goods or services.

131. As set out above, the õWHO DATö Trademarks have a high degree of distinctiveness and fame, are widely recognized by the general consuming public of the United States and around the world, and have been continuously used in connection with advertising and sales on a national scale in various channels of trade by Who Dat?, Inc. for almost three decades.

132. The NFLP and Saints adopted the mark after Who Dat?, Inc.'s "WHO DAT" Trademarks became famous and used said mark in commerce in ways set forth above that caused, or will likely cause, dilution of the quality and reputation of Who Dat?, Inc.'s "WHO DAT" Trademarks and diminished the capacity of the mark to identify and distinguish the goods and services of Who Dat?, Inc.

133. As a result of the above, the Saints and the NFLP are liable herein to Who Dat?, Inc. for any or all of the remedies provided, including the recovery of profits and damages since the acts were committed with knowledge that such marks are intended to be used to cause confusion or mistake or to deceive or dilution.

134. The aforesaid acts of Defendants constitute trademark infringement and dilution in violation of Title 51 of the Louisiana Revised Statutes.

135. The aforesaid acts of the Saints, the NFLP, and the State of Louisiana have been intentional, willful and in bad faith.

136. Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## XV.    COUNT 10: UNFAIR COMPETITION

137. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-136 of this Complaint.

138. The aforesaid activities of the Saints and the NFLP constitute the use of words, terms, names, symbols and devices and combinations thereof, false designations of origin and false and misleading representations of fact that are likely to cause, and have caused, confusion or to cause, and have caused, mistake or to deceive as to the affiliation, connection or association

of the Saints and the NFLP with Who Dat?, Inc., or as to the origin, sponsorship or approval of the Saints' and the NFLP's goods, services or other commercial activities by Who Dat?, Inc..

139. The aforesaid activities of Defendants constitute the use of words, terms, names, symbols and devices and combinations thereof, false designations of origin and false and misleading representations of fact that in commercial advertising or promotion misrepresent the nature, characteristics or qualities of the Saints' and the NFLP's goods, services or other commercial activities.

140. The aforesaid activities of Defendants constitute false and misleading descriptions or representations of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and Louisiana law.

141. The aforesaid activities of Defendants amount to an unfair competition against Who Dat?, Inc. in that the Defendants acted in concert with one another to interfere with the actual and prospective business relationships, including relationships with suppliers or distributors, of Who Dat?, Inc. and said wrongful conduct was undertaken to cause Who Dat?, Inc. to lose the opportunity it carefully positioned itself to enjoy.

142. The Defendants facilitated the aforementioned activities by passing off the Plaintiff's "WHO DAT" Trademarks and goods and services as their own.

143. The aforesaid acts of Defendants have caused and are causing great and irreparable harm and damage to Who Dat?, Inc., and unless preliminarily and permanently restrained by this Court, said irreparable injury will continue.

144. Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## XVI.        COUNT 11: FEDERAL DILUTION

145. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-144 of this Complaint.

146. The aforesaid acts of the Saints, the NFLP, and the State of Louisiana constitute dilution of the distinctive quality of the famous õWHO DATö Trademarks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

147. The aforesaid acts of the Saints, the NFLP, and the State of Louisiana have been intentional, willful and in bad faith.

148. The aforesaid acts of the Saints, the NFLP, and the State of Louisiana have caused and are causing great and irreparable harm and damage to Who Dat?, Inc., and unless preliminarily and permanently restrained by this Court, said irreparable injury will continue.

149. Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## XVII. COUNT 12: FEDERAL COMMERCIAL AND PRODUCT DISPARAGEMENT

150. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-149 of this Complaint.

151. The aforesaid acts of the Saints, the NFLP, and the State of Louisiana have caused and are causing great and irreparable harm and damage to Who Dat?, Inc., and unless preliminarily and permanently restrained by this Court, said irreparable injury will continue.

152. The statements the Saints, the NFLP, and the State of Louisiana have made in the press and elsewhere about Who Dat?, Inc.øs interest in and ability to own or control the õWHO DATö Trademarks were false and harmful to Who Dat?, Inc.øs economic interests and to the character of its business.

153. The Saints, the NFLP, and the State of Louisiana knew or should have known that their statements were false and would have a detrimental impact on Who Dat?, Inc., or the Saints, the NFLP, and the State of Louisiana made these false statements with reckless disregard for whether they were true and without verifying the accuracy of their statements.

154. The Saints, the NFLP, and the State of Louisiana made these statements with the intent to interfere with Who Dat?, Inc.'s ability to control or own the "WHO DAT" Trademarks and with Who Dat?, Inc.'s other economic interests.  These statements were made without any privilege to do so.

155. As a proximate result of the Saints, the NFLP, and the State of Louisiana's misconduct, Who Dat?, Inc. has suffered damages.

156. Because Defendants' actions were malicious and/or grossly negligent, Who Dat?, Inc. is also entitled to punitive damages.

157. Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## XVIII. COUNT 13: NEGLIGENCE

158. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-157 of this Complaint.

159. The representations made by the Saints, the NFLP, and the State of Louisiana publicly and privately to third parties that "WHO DAT" belonged to the Saints, the NFLP, or the public domain contained inaccurate, false, and misleading information.

160. Due to the special relationship of the parties, the Saints, the NFLP, and the State of Louisiana had a duty to exercise reasonable care when making representations about the ownership of the "WHO DAT" Trademarks.

161. The Saints, the NFLP, and the State of Louisiana failed to exercise reasonable care or competence when making these misrepresentations.

162.    As described above, Who Dat?, Inc. was poised to enter into substantial contracts with companies like Coca-Cola that would naturally want to capitalize on the widespread popularity of the ōWHO DATö Trademarks.

163.    Due to the confusion created as to the ownership of the ōWHO DATö Trademarks the opportunity was lost.

164.    As a proximate result of this negligent conduct, Who Dat?, Inc. has sustained damages.

165.    The Saints, the NFLP and the State of Louisianaøs actions were willful and wanton, and Who Dat?, Inc. is also entitled to punitive damages.

166. Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## XIX.   COUNT 14: FRAUD

167. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-166 of this Complaint.

168. As set out above, the Saints specifically represented that they, among other things, were assigning, transferring and conveying to Who Dat?, Inc., the ōWHO DATö registration obtained in 1988.  In order to convince Who Dat?, Inc. of same, the Saints event sent Who Dat?, Inc. a copy of a letter that was purportedly sent on September 2, 1988 to the Secretary of State of Louisiana to effect such assignment on the books of the State of Louisiana.  However, said letter was never sent to the Secretary of State and instead the Saints allowed the State of Louisianaøs

records to continue to reflect that the Saints were the true owners of the mark from that day forward.

169. The Saints knew and intended that Who Dat?, Inc. would rely on these fraudulent misrepresentations and that Who Dat?, Inc. would be – and was – harmed by same.

170. Said conduct was designed to perpetrate a fraud on Who Dat?, Inc. and third parties were deceived into believing that the Saints were the true owners of the "WHO DAT" marks. Moreover, the Saints were able to fraudulently convince others that Who Dat?, Inc. was not the true owner of the "WHO DAT" Trademarks.

171. As described above, Who Dat?, Inc. was poised to enter into substantial contracts with companies like Coca-Cola that would naturally want to capitalize on the widespread popularity of the "WHO DAT" Trademarks.

172. Due to the confusion fraudulently created as to the ownership of the "WHO DAT" Trademarks the opportunity was lost.

173. As a consequence of the Saints' misleading, false, and malicious representations, Who Dat?, Inc. has sustained damages.  The Saints' actions were fraudulent which entitles Who Dat?, Inc. to an award of punitive damages.

174. Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## XX.   COUNT 15: VIOLATIONS OF FLORIDA TRADEMARK LAW

175. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-174 of this Complaint.

176. In connection with the Super Bowl the Saints applied for a trademark registration for "WHO DAT" in Florida.  Said registration was signed by Tom Benson.

177. As set out above, the Saints and the NFLP have used in Florida, without the consent of Who Dat?, Inc., reproductions, counterfeits, copies, or colorable imitations of the öWHO DATö Trademarks (registered Who Dat?, Inc.) in connection with the sale, offering for sale, or advertising of goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services.

178. As set out above, the Saints and the NFLP have in Florida reproduced, counterfeited, copied or colorably imitated the öWHO DATö Trademarks and have applied such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used upon or in conjunction with the sale or other distribution in this State of such goods or services.

179. As a result of the above, the Saints and the NFLP are liable herein to Who Dat?, Inc. for any or all of the remedies provided, including the recovery of profits and damages since the acts were committed with knowledge that such marks are intended to be used to cause confusion or mistake or to deceive.

180. The aforesaid acts of Defendants constitute trademark infringement in violation of Florida Law.

181. Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## XXI.   COUNT 16: CONSPIRACY

182. Who Dat?, Inc. hereby realleges and incorporates by reference the allegations of paragraphs 1-181 of this Complaint.

183. The Saints, the NFLP, and the State of Louisiana conspired to defraud Who Dat?, Inc. by, among other things, acting in concert to mislead Who Dat?, Inc. by misrepresenting to

the general consumer the origin and ownership of the ōWHO DATö mark.  The Saints, the NFLP, and the State of Louisiana also acted in concert to disparage Who Dat?, Inc. and to interfere with its prospective and other business relationships by engaging in a coordinated public effort to disseminate false information about Who Dat?, Inc. for the purpose of driving Who Dat?, Inc. out of business or making it impossible for Who Dat?, Inc. to continue to commercially use the ōWHO DATö marks.

184. The Saints, the NFLP, and the State of Louisiana have made misrepresentations to and about Who Dat?, Inc. and the general consumer or failed to communicate critical truthful information in furtherance of the Saints, the NFLP, and the State of Louisianaøs illegal scheme.

185. As a consequence of same, Who Dat?, Inc. has sustained damages.  Through this action, Who Dat?, Inc. seeks all of the available damages and remedies available under the law for itself.

## XXII.  ATTORNEYS FEES AND COSTS

186. Who Dat?, Inc. prays for recovery from Defendant of all reasonable attorney fees of counsel for Who Dat?, Inc., and all costs of this action, as allowed under law.

## XXIII. INTEREST

187. Who Dat?, Inc. seeks prejudgment interest and post-judgment interest in the maximum amounts allowed by law.

## XXIV. JURY DEMAND

188. Who Dat?, Inc. requests a trial by jury.

## XXV.  CONCLUSION AND PRAYER

189. WHEREFORE, Who Dat?, Inc. respectfully requests that Defendants be cited and required to appear herein and that after a trial on the merits a judgment be entered as follows:

a.  That Who Dat?, Inc. obtain an order enjoining the Restrained Parties from:

    i.  declaring that the phrase "WHO DAT" is in the public domain;

    ii.  sending cease and desist letters to individuals and entities using the "WHO DAT" marks;

    iii.  instructing individuals and entities using the "WHO DAT" marks to cease using same;

    iv.  interfering with or thwarting the "WHO DAT" marks by refusing to act in good faith with respect to the "WHO DAT" marks;

    v.  further engaging in manipulative business strategies designed to interfere with Who Dat?, Inc.'s business relations, disparage Who Dat?, Inc.'s economic interests, and damage Who Dat?, Inc.'s ability to negotiate with others to use the "WHO DAT" Trademarks;

    vi.  taking any action or making any statements that are adverse to Who Dat?, Inc.'s interests in the "WHO DAT" Trademarks;

    vii.  destroying, removing, or secreting documents, records and other information related to the claims and allegations set forth in this lawsuit;

    viii.  denying that in September of 1988 the Saints assigned, transferred and conveyed to Who Dat?, Inc. whatever right, title, and interest whatsoever that the Saints had or claimed to have in the "WHO DAT" trademark;

    ix.  denying that Who Dat?, Inc. has exclusive right and title to the name and/or character, or the validity of the "WHO DAT" trademark and all derivations thereof;

x.   assisting or aiding others in disputing or contesting, directly or indirectly, Who Dat?, Inc.'s exclusive right and title to the name and/or character, or the validity of the "WHO DAT" trademark and all derivations thereof;

xi.   denying that Who Dat?, Inc. has the right, through first usage, to the Saints' registration filed in 1988;

xii.   denying that the phrase "WHO DAT" or any of its derivations is unique and original and Who Dat?, Inc. is the owner thereof;

xiii.   denying that as a result of Who Dat?, Inc.'s exploitation of the "WHO DAT" name and/or character therein and otherwise, Who Dat?, Inc. has acquired a substantial and valuable goodwill therein;

xiv.   denying that as a result of Who Dat?, Inc.'s exploitation of the "WHO DAT" name and/or Character is inherently distinctive or it has acquired a secondary meaning, and the Characters themselves have established a meaning distinct from any prototypes on which they may have been based;

xv.   denying that Who Dat?, Inc.'s territory for the "WHO DAT" trademark and all derivations thereof includes the United States;

xvi.   using on or in connection with the production, manufacture, advertisement, promotion, displaying for sale, offering for sale, sale, or distribution of any articles of merchandise, or for any purposes whatsoever, the "WHO DAT" Trademarks or any colorable imitations thereof;

xvii.   using in connection with the production, manufacture, advertisement, promotion, displaying for sale, offering for sale, sale or distribution of any

articles of merchandise, any combination of identifying designations of the Who Dat?, Inc. or any colorable imitations of any of the above;

xviii.   representing by any means whatsoever, directly or indirectly, or doing any other acts or things calculated or likely to cause confusion, mistake or to deceive purchasers into believing that Restrained Parties products originated with or are the products of Who Dat?, Inc., or that there is any affiliation or connection between Who Dat?, Inc. and the Restrained Parties or their products and from otherwise unfairly competing with Who Dat?, Inc.; and

xix.   using any mark in a manner so as to cause the dilution of the distinctive quality of the famous ōWHO DATö Trademarks.

b.   That Who Dat?, Inc. recover all profits derived by Defendants from the ōWHO DATö marks;

c.   That Who Dat?, Inc. recover all profits derived by third parties since October 1, 2009 from the ōWHO DATö marks;

d.   That Who Dat?, Inc. recover the diminished value of the ōWHO DATö marks;

e.   That Defendants and those controlled by Defendants be required in accordance with 15 U.S.C. § 1118, to recall and deliver up to the Court for destruction all merchandise that bears simulations of the registered trademarks of the Who Dat?, Inc. and all advertisements, packages, containers, labels, signs, prints, wrappers, binders, covers and all advertisements that are, or that embody, any reproduction, copy, counterfeit or colorable imitation of Who Dat?, Inc.øs registered trademarks and all plates, molds, and other means of making the same;

f.  That Who Dat?, Inc. recover its damages sustained as the result of Defendants' federal trademark infringement, unfair competition and dilution and that the Court exercise its discretion and enter a judgment for such additional sums as the Court shall find to be just, according to the egregious nature of the acts of Defendants;

g.  That Who Dat?, Inc. have and recover treble damages under 15 U.S.C. § 1117 by reason of the willful and deliberate acts of federal trademark infringement by Defendants;

h.  That Who Dat?, Inc. have and recover double damages under Louisiana law by reason of Defendants' acts of deceptive advertising;

i.  That Who Dat?, Inc. have and recover punitive damages under Louisiana law in the amount of twice the combined total of Who Dat?, Inc.'s actual loss by reason of Defendants' acts in violation of Louisiana state law;

j.  That Who Dat?, Inc. have and recover damages by reason of Defendants' acts of common law trademark infringement, disparagement and unfair advertising;

k.  That Defendants be directed to file with this Court and to serve upon Who Dat?, Inc.øs within thirty (30) days after service upon Defendants of this Court's injunction issued in this action, a written report by Defendants under oath setting forth in detail the manner in which Defendants have complied with the injunction.;

l.  That Defendants be required to account to Who Dat?, Inc. for the profits arising out of their unlawful activities;

m. That Who Dat?, Inc. recover prejudgment interest and post-judgment interest;

n. That Who Dat?, Inc. have and recover their reasonable attorneys' fees pursuant to

15 U.S.C. § 1117 and Louisiana law;

o. That Who Dat?, Inc. have and recover their costs and disbursements herein; and

p. That Who Dat?, Inc. have such other and further relief as the Court may deem just

and proper.

Respectfully submitted,

___/s/ Joseph S. Piacun_____

JOSEPH S. PIACUN (25211)
THOMAS A. GENNUSA, II (6010)
REID S. UZEE (31345)
Gennusa, Piacun & Ruli
4405 North I-10 Service Road, Suite 200
Metairie, Louisiana 70006
Telephone: (504) 455-0442
Facsimile: (504) 455-7565
Email: jpiacun@gprlawyers.com

-and-

Ricardo G. Cedillo
Texas State Bar No. 04043600
DAVIS, CEDILLO & MENDOZA, INC.
McCombs Plaza, Suite 500
755 E. Mulberry
San Antonio, Texas 78212
(210) 822-6666 ó *telephone*
(210) 822-1151 ó *facsimile*
rcedillo@lawdcm.com
Pro Hac Vice Motion Pending

**ATTORNEYS FOR PLAINTIFF**
**WHO DAT?, INC.**



EXHIBIT A



000080208090000

<u>AGREEMENT</u>

THIS AGREEMENT between WHO DAT ?, INC., a Louisiana corporation, with principal place of business at 4305 California St., City of Kenner, State of Louisiana, herein called the Licensor, and Tee's Unlimited, a Louisiana corporation, with principal place of business at 2307 Richland Street, City of Kenner, State of Louisiana, herein called the Licensee.

The Licensor is engaged in the business of marketing products and/or concepts based upon the Who Dat? concept, and said name, has been trade marked and assigned in the licensor's name.  The Licensee desires to utilize the name and/or characterization.

<u>COMMERCIAL EXPLOITATION:  MERCHANDISING</u>

and the Licensor is willing to permit the Licensee to do so, on the terms and conditions hereinafter set forth.

NOW THEREFORE in consideration of the premises and of the mutual promises and undertaking herein contained, and for other good and valuable considerations, the parties agree as follows:

1. Grant of License:  The Licensor hereby grants to the Licensee, and the Licensee accepts from the Licensor, a license to utilize the name and/or characters more particularly described in clause 2 in, upon or in connection with articles specified in clause 3 (herein called the Articles), to be manufactured, sold and/or distributed by the Licensee.

2. Characters:  The Characters and name referred to in clause 1 shall consist of the following phrase only: Who Dat Say Dey Gonna Beat Dem Saints Who Dat?, with the designs connected therewith, said phrase and design is as more specifically shown on Exhibit "A", attached hereto and made a part hereof.

Licensor agrees not to license any other party to use said phrase, within the State of Louisiana.

1

EXHIBIT C

In utitlizing the characters hereunder, the Licensee shall endeavor to adhere as faithfully as may be practicable to the form in which the name has appeared in the design of said name, due allowance for modifications necessitated by the change from one medium into another.  No substantial departures shall be made in the general appearance of the characters without the Licensor's prior written consent.

3. The Articles:  The Licensee shall have the right to utilize the name in, upon or in connection with T-Shirts and no other goods, wares or merchandise of any kind whatsoever.

4. Territory:  The Licensee's territory shall be as follows:  The State of Louisiana.  The licensee shall be authorized, as well as others, also for the states of Mississippi and Alabama.  The Licensee's exploitation (meaning thereby manufacture, sale, distribution and general promotion) of the Articles shall be confined and limited to the aforesaid territory and shall not extend to any other territories or countries. It is the intention of the parties that the Articles be manufactured in the Licensee's aforesaid territory, and distributed and sold there to ultimate users.  No Articles shall be manufactured outside the territory for wholesale or retail sale in the territory; and no Articles shall be manufactured in the territory for export therefrom.

5.  Duration:  This agreement shall commence on the signing of this agreement and shall terminate at the end of the 1984-85 New Orleans Saints football season.

6. Quality; Sample:  The Licensee acknowledges that if the Articles manufactured and sold by it were of inferior quality in design, material or workmanship, the substantial good will which the Licensor has built up and now possesses in the name would be impaired.  Accordingly the Licensee undertakes that the Articles shall be of high standard and of such style, appearance and quality as shall be reasonably adequate and suited to their exploitation to the best advantage.

2

(a) To this end the Licensee shall, before it sells or distributes any of the Articles, furnish to the Licensor free of cost, for its written approval, a sample of each Article together with its cartons and containers, including packing and wrapping material.  The Licensor shall not unreasonably withhold its approval.

(b) If the Licensor does not indicate its approval or disapproval of a sample within (two weeks) of the date of submission, it shall be deemed to have approved the same.

(c) Once sample of the Articles have been approved, either expressly or by implication as aforesaid, the Licensee shall not depart therefrom without the Licensor's prior consent.

7.  Royalty:  In consideration of this licese, the Liscensee shall pay to the Licensor, during the original term of the agreement, a royalty of $0.72 on each T-Shirt sold or shipped by the licensee.

8.  Advance:  Simultaneously herewith the Licesee will pay to the Licensor the sum of $350.00 as an advance against royalties.  Said payment will be made upon the signing of this agreement.

9.  Accounting:  No later than the 10th day of each calendar month during the term of this agreement and any extention thereof, and thereafter so long as any sales are made by the Licensee pursuant to the provisions of clause 23, the Licensee shall furnish to the Licensor a full, complete and accurate statement showing the sales of the Articles sold, and the prices received therefor.

10.  Payment:  Simultaneously with the rendition of statements as aforesaid, the Licensee shall pay to the Licensor such royalties on the sales indicated on the statements as the latter may be entitled to receive hereunder.

3

11. Books and Records: The Licensee shall keep full, complete and accurate books of account and records covering all its transactions relating to the subject matter of this agreement. The Licensor, through its authorized representative, shall have the right to examine such books of account and records and other documents and material in the Licensee's possession or under its control insofar as they relate to the manufacture and the sale of the Articles. The Licensor shall have free and full access thereto for such purpose and for the purpose of making extracts therefrom at all reasonable hours of the day during which the Licensee's offices are open. The Licensee shall preserve such books of account, records, documents and material for a period of (two) years after the expiration of this agreement.

12. Good Will: The Licensee acknowledges:

(a) That the name Saints is a Club Mark of the New Orleans Saints football team and is a league mark licensed and/or owned by National Football League Properties, Inc., as well as Who Dat in a context utilizing the Saints team colors black and gold or any other context making reference to or association with the Saints.

(b) That the name and/or character of Who Dat or any of its derivations is unique and original and that the Licensor is the owner thereof.

(c) That as a result of the exploitation of the Who Dat name and/or character therein and otherwise, the Licensor has acquired a substantial and valuable good will therein;

(d) That the Who Dat name and/or Character has acquired a secondary meaning, and the Characters themselves have established a meaning distinct from any prototypes on which they may have been based; and

(e) That any copyrights, trade-marks and design patents heretofore obtained by the Licensor or in connection with the Who Dat name and/or Character are good and valid.

The Licensee shall not during term of this agreement or at any time thereafter, dispute or contest, directly or indirectly the licensor's exclusive right and title to the name and/or character, or the validity of the Licensor's copyrights,

trade-marks or design patents thereon, nor shall the Licensee assist or aid others in so doing.  However, the Licensor makes no representation or warranty to the Licensee with regard to the validity of the aforesaid copyrights, trade-marks or design patents.  The Licensee shall cooperate with the Licensor in preventing any infringement thereof.

13. Licensee's Efforts:  The Licensee shall exert reasonable efforts to exploit and promote sales of the Articles.

14. Advertising:  The Licensee shall have the right in its territory and for the sole purpose of selling and exploiting the Articles, to use the name, designs and typical representations of the Characters on cut-outs, window strips, display backgrounds and other advertising matter usually employed in the merchandising of T-Shirts.  However, no such material or other advertising matter shall be made or used by the Licensee without first submitting the same, together with a general outline of the use to be made thereof, to the Licensor for its written approval.  If the Licensor does not indicate its disapproval within two weeks of the date of submission, it shall be deemed to have approved the same. (In no event shall the Licensee undertake any billboard, radio or television advertising in connection with the Articles without the Licensor's written consent.)

15. Limited Grant:  Nothing herein contained shall be construed as an assignment or grant to the Licensee of any right, title or interest in or to the name and/or in or to any copyright, design patent of trade mark on the name and/or Characters or the names applied to them, beyond a grant of a limited non-exclusive license on the terms herein specified. The Licensor shall have the right, without any restriction whatever, to grant any other licenses with respect to the Characters or any of them that it may desire, including licenses for merchandise similar to the Articles embraced herein, and in the same territory, except as outlined herein.

16. Indemnification:  Who Dat ?, Inc. agrees to hold harmless and indemnify Tee's Unlimited from any litigation from NFL Properties, Inc. with regard to Tee's authorization from Who Dat? Inc., of the hereinabove referred to T-shirt.

5

17. Cessation of Use:  Except as otherwise provide in Clause 23, the Licensee shall, forthwith upon the expiration of this agreement or any extension thereof, or upon its sooner termination, discontinue the use of the name and/or Characters and all names, trade-marks, figures, designs and drawings in connection therewith, and shall not again use the same in any manner whatsoever.  In case of violation of this provision, remedy by injunction shall lie.

18. Indemnity:  The Licensee shall hold the Licensor harmless from and against any loss, expense or damage occasioned by any claim demand, suit or recovery against the Licensor arising out of the unauthorized use of any patent, process, method or device by the License in connection with the Articles.

19. Sales by Licensee:  The Licensee shall sell and distribute the Articles only to jobbers and wholesalers for sale and distribution to retail stores, and to retail stores for sale and distribution direct to the public.  The Licensee shall exercise due care to avoid selling or distributing the Articles to jobbers, wholesalers, distributors, retail stores or merchants whose sales or distribution are or will be made solely for publicity purposes, combination sales, premiums, give-aways or similar methods of merchandising, or whose business methods are questionable.

20. Licensee's Breach: If the Licensee breaches any of the terms and provisions of this agreement on its part to be performed, whether such breach pertains to a default in royalties or otherwise, the Licensor shall have the right, if it so elects, to serve upon the Licensee a written notice of its intention to terminate this agreement.

    (a) The Licensee shall thereupon have a period of 10 days within which to remedy the breach.

    (b) If the Licensee fails duly to remedy the same, then upon expiration of the 10 days this agreement

6

and the license herein granted shall
respects cease and terminate, and th
shall have no further rights hereun'

(c) Notwithstanding such termination, t
rights arising out of this agreement or in
with or existing prior
shall nevertheless continue in full force and
effect, including the Licensor's right to sue
for damages caused to it by the Licensee's breach
and the Licensor's right to receive
unpaid royalties.

21. Licensee's Bankruptcy:  If the
insolvent, or is a petition in bankruptcy or for re-
organization is filed by or against it, or if any insolvency
proceedings are instituted by or against it under state or
federal laws, or if it makes an assignment for the benefit
of its creditors, or if a receiver is appointed for its
property and business, and remains undischarged for a period
of ten days, or is it liquidates its business in any manner
whatsoever, or if any distress, execution or attachment is
levied on such of its manufacturing or other equipment as
is used in the production and distribution of the Articles and
remains undischarged for a period of ten days, or if the
Licensee abandons the manufacture of the Articles, the
Licensor shall have the right, if it so elects, to terminate
this agreement, and the license hereby granted upon five days
notice in writing to Licensee.  Upon the expiration of such five
days this agreement and the license hereby granted shall cease
and terminate, but the Licensee shall continue to be liable to
the Licensor as provided in clauses 22 and 28.

22. Sales After Expiration:  Upon the expiration of this
agreement or any extension thereof, but not upon its sooner
termination for any reason whatsoever, the Licensee shall
have the right, provided it has theretofore duly performed all

obligations hereunder, for a period of not more
days thereafter to dispose of all unsold Articles
manufactured by it or in the process of manuf...
the period of sixty days prior to such expir...
condition precedent to the Licensee having any such right, it
shall be obligated to furnish the Licensor, within three days
of such expiration, an itemized statement sworn to by an
authorized officer of the Licensee setting forth in detail
all such unsold Articles. However, the Licensee shall not
be relieved of its obligation to account to Licensee as
herein provided.

23. No Joint Venture:  The Licensee shall not use the
name or credit of the Licensor in any manner whatsoever, nor
incur any obligation in the Licensor's name.  Nothing herein
contained shall be construed to constitute the parties as
joint venturers, nor shall any similar relationship be deemed
to exist between them.

24. No Assignment:  The license hereby granted is and
shall be personal to the Licensee, and shall not be assign-
able by any act of the Licensee or by operation of law.  The
Licensee shall have no right to grant any sub-licenses.  Any
attempt by it to grant a sub-license or to assign, mortgage
or part with possession or control of this license or any of
its rights hereunder shall constitute a material breach.
This agreement shall enure to the benefit of and shall be
binding upon the Licensor's successors and assigns.

25. Waiver; Modification:  No waiver or modification of
any of the terms of this agreement shall be valid unless in
writing. No waiver by either party of a breach hereof or a
default hereunder shall be deemed a waiver by such party of a
subsequent breach or default of like or similar nature.

26. Remedies: All specific remedies provided for in this
agreement shall be cumulative, and shall not be exclusive of
one another or of any other remedies available in law or equity.

27. Notices: Whatever notice i reqr'
under this agreement, a writing signed
party serving such notice, and mailed
return receipt requested, to the othe
deemed good and sufficient notice. ... shall be
addressed to the parties at the addresses ... n on page
1 orein.

28. Construction: This agreement shall be construed in
accordance with the laws of the State of Louisiana entirely
ir... of any forum in which the ag... or any part
of it may come up for construction, interpretation of
enforcement.

29.  Entire Agreement: This agreement contains the
entire understanding of the parties.  There are no represen-
tations, warranties, promises, covenants or undertakings other
than those herinabove contained.

IN WITNESS WHEREOF the parties hereto have caused
these presents to be signed by their duly authorized officers
this _____ day of August, 1984.


Attest:                                    WHO DAT ?, INC.



_____         By  _____
Secretary                                  Authorized Officer




Attest:                                    TEE'S UNLIMITED



_____         By  _____
Secretary                                  Authorized Officer


9



EXHIBIT D

WHO DAT!
1988 MERCHANDISING PROGRAM TARGETED PARTICIPANTS

American Needle --   Headwear 500

New Era --  Headwear 500

Creative Photo  --  Musical Buttons, Musical Caps 250

Golden Squeegee  --  "Fandana" Handkerchiefs 500

Toland  --  Floor and Car Mats 100

Mueller  --  Beverage Bottles w/sipper 250

Bushnell  --  Can Handlers, Ceramic and Glassware 500

Dixie  --  Miniature License Plates 100

F. C. --  License Plate Frames  50

Betras  --  Polyurethane Mugs, Cups 500

Country Lane  --  French Milled Soaps 100

Cuddles  --  Suspenders, Headbands 250

EBC  --  Bottle Opener Magnets  100

Freemont  --  Fan Parking Signs 100

Karanne  --  Miniature Mascot Fuzzy Pins, Magnets 250

McArthur  --  Handkerchiefs, Towels 250

P&K  --  Wastebaskets, Wall Decors 500

Thermo --  Insulated Mugs, Cups, Styrofoam Coolers 500

Trench  --  Youth and Adult T-Shirts, Sweatshirts, Jerseys, 500
              Pennants, Buttons

Creative --  Pewter Key Rings, Coasters, Lapel Pins 100

Quantasia  --  Lunchboxes, Mechanical Pencils, Ballpoint Pens, 500
                Lapel Pins

Staco  --  Visors  100

Thermometer  --  Thermometers  250

Pro Scent  --  Air Fresheners 100

Scrubbs  --  Scrubb Tops, Pants 500

EXHIBIT E



EXHIBIT F



EXHIBIT G

## METRO NEWS

# 'Who dat' paying off for rivals

**By RICHARD BOYD**
*West Bank bureau*

For most New Orleanians, "Who Dat" has become shorthand for proclaiming the triumphs of the Saints. But for Steve and Sal Monistere and Allen J. Maxwell, it means more. It means money.

When the Saints flirted with a playoff bid four years ago, Steve Monistere and his then-partner, Carlo Nuccio, formed Who Dat Inc. The company produced a record featuring Aaron Neville and the 1983 Saints and a black T-shirt with "Who Dat" printed in gold across the front.

In the same year, Maxwell, owner of Tee's Unlimited in Kenner, produced a white T-shirt with a black fleur-de-lis on the front and the words, "Who dat say dey gonna beat dem Saints, who dat."

Doing what good entrepreneurs do in such situations, they went to court. Monistere sued Maxwell and state court Judge Jacob Karno in Gretna had to decide who had the rights to "Who Dat."

During the court proceedings, the Monistere side showed the judge a video of sportscaster Ron Swoboda at the recording session where a "Who Dat" song was made. He watched a video of the New Orleans City Council proclaiming "Who Dat Day." He heard a tape of a Marine band playing the song on the West Bank at a reception for then presidential candidate John Glenn. He was told of plans for a "Who Dat" beer and "Who Dat" orange drink and a seemingly endless line of "Who Dat" novelties.

Maxwell countered that the phrase was in the public domain and produced a 1981 magazine article about St. Augustine High School that said the "Who Dat" chant has been popular since the 1960s. Maxwell said he grew up hearing it and that it has been used at Louisiana State University. He claimed the phrase has been popular for decades in the 9th Ward.

Karno agreed with Maxwell but said the two could still sue



Sal, left, and Steve Monistere and Ellis Pailet with Saints paraphernalia.
STAFF PHOTO BY ELIOT KAMENITZ

### Follow-up

each other for damages and that one side could establish what is known as a "secondary meaning" for the phrase.

A month later, NFL Properties Inc., the franchising company owned by the 28 members of the National Football League, awarded Who Dat Inc. exclusive franchising rights to the phrase. "We established our secondary meaning to the phrase," said Ellis Pailet, Monistere's lawyer.

Around the same time, Maxwell got an NFL Properties franchise that allowed his company to produce more traditional Saints products.

With the Saints in the playoffs, both entrepreneurs say they are happy.

Monistere in 1984 moved to San Antonio and runs Who Dat Inc. with his brother. Nuccio, a musician, sold his interest and moved to Los Angeles.

"Everyone thinks we are making a killing," Monistere said. "We still work hard. We have a lot expenses. We aren't making a killing."

Maxwell said he is producing 1,200 Saints T-shirts an hour at his Kenner plant but none of them have "Who Dat" on them.

Monistere's current "Who Dat" projects, for which he receives royalties, include "Who Dat" champagne marketed by Martin Wine Cellar, jewelry marketed by Aucoin-Hart and Sue's in Metairie; a new record featuring Aaron Neville, a "Who Dat" Christmas song featuring a group of Texas children, and all the T-shirts, lighters, buttons, pennants, flash cards, license plates that it takes to cheer the team to the playoffs.



COMPARE MORTGAGE RATES

GLOBE HOMESTEAD ASSOCIATION

"Your Money Is Safe"

529-1504

EXHIBIT H

# NEW ORLEANS
## LOUISIANA
# SAINTS

**IN THIS ISSUE**
- Season Ticket Record
- Summer Calendar
- LaCrosse Awaits

Vol. 20, No. 3          TRAINING CAMP, 1988

# Who Dat! Fan Club New for '88

Unifying all Saints fans under one banner, the Saints Official Who Dat! Fan Club will conduct its charter membership drive through August at area locations of four major businesses: Time Saver, McDonald's, TicketMaster and Benson auto dealerships.

The club takes its name from the distinct cheer that has become identified as the battle cry of the diehard Saints fan: "Who Dat Say Dey Gonna Beat Dem Saints? Who Dat! Who Dat!"

"There's nothing like it that I know of in our league," Saints president Jim Finks said of the Who Dat! phenomenon. "The words 'Saints Fan' and 'Who Dat!' have become interchangeable. Last year everyone around the country came to understand that loyal Saints followers, not just the people who come to the games, are Who Dats!

"Besides its unique quality, I like the fact that Who Dat! is a fun thing. Our fans like to have fun."

The new club carries a one-time, lifetime membership fee of $12. Fans who join prior to the start of the Saints 1988 season will receive a special charter member designation.

With their membership, fans receive an official membership certificate and an official membership card that will hold several benefits in the exciting months to come. In addition, those who join receive a membership kit that features a lapel pin, key fob, badge, bumper sticker and mini pennant — all available only to members of the club.

Time Saver, McDonald's, TicketMaster and Benson Automotive World have been designated as Saints Who Dat! fan headquarters for the charter membership drive. Membership applications will be available at all locations of Time Saver, McDonald's, TicketMaster and Benson auto dealerships.

In addition, applications will be available at the Saints' Superdome ticket office.

Archie Manning, former Saints quarterback, has agreed to serve as national president and head a board of directors that includes Pete Fountain, Angela Hill, Aaron Neville, Ron Swoboda, Rich Mauti, Danny Abramowicz, Marie Knutson, Frank Davis.

(continued on page 6)



## SAINTS YEARBOOK AVAILABLE SOON

Commemorative of the Saints first winning season and first playoff year, the Saints Official Yearbook will roll off the presses in July and be available exclusively at all Shoetown locations beginning July 29.

The 92-page, four-color collectible publication will be the focus of a special Saints-Shoetown promotion through which the book will be offered at a special price.

Beginning in September, the yearbook will be available on newsstands for the full $5 cover price.

In addition to feature stories on Tom Benson, Jim Finks and Jim Mora, the yearbook takes an in-depth look at the team's three units: offense, defense and special teams. A look back at 1987 and a look ahead to 1988 are among the stories developed and written by an impressive lineup of area journalists.

This is the first official yearbook published for the team since the early days of the franchise. The special souvenir edition is produced by the Sports Publishing Group and the New Orleans Saints.

EXHIBIT I



## SAINTS

TRANSFER, ASSIGNMENT & CONVEYANCE

Whereas NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP has registered the mark WHO DAT! in the Louisiana State Trademark Office; and

Whereas NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP does hereby assign, convey and transfer for valuable consideration whatever right, title and interest whatsover that NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP, has or claims to have in the trademark WHO DAT!, to WHO DAT?, INC.; and, that WHO DAT?, INC. has through first use of the mark(s), WHO DAT!, WHO DAT? or any of its derivations acquired exclusive right to use said mark(s) and said NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP, does so acknowledge this fact.

NEW ORLEANS LOUISIANA SAINTS LIMITED PARTNERSHIP

BY: _____
Greg Suit, Director of Marketing

EXHIBIT J



SAINTS

September 2, 1988

Ms. Donna Rivere
Secretary of State's Office
Trademark Section
State of Louisiana
P. O. Box 44125
Baton Rouge, LA  70804

RE:  Who Dat ?, Inc.

Dear Ms. Rivere:

Enclosed please find a transfer, assignment and conveyance
of the Who Dat! mark that we have filed.  I authorize you to
transfer the registration we filed to the first usage party of
said phrase, Who Dat ?, Inc.

As the New Orleans Saints thru their official "Who Dat!
Saints Fan Club" have an interest in the fact that Who Dat?, Inc.
has filed registrations for the mark Who Dat or any other derivation
thereof, and has first use of said mark, we would appreciate if you
would not file any other Who Dat marks other than on behalf of
Who Dat?, Inc.  In addition, I would appreciate your canceling all
trademarks filed after Who Dat?, Inc. filed their trademarks in 1983.

Thank you for your kindness and consideration in this matter.

Very truly yours,

Greg Suit
Director of Marketing

EXHIBIT K

## AGREEMENT

THIS AGREEMENT between WHO DAT?, INC., a Louisiana corporation, with principal place of business at, Suite 107, 818 Howard Avenue, New Orleans, La. 70113, State of Louisiana, herein called the Licensor, and SPORTS/CELEBRITY INCENTIVES, INC., individually, and on behalf of the New Orleans Louisiana Saints Limited Partnership, with a mailing address at 1315 W. 22nd Street, Suite 250, Oak Brook, Illinois 60521, herein called the Licensee.

### COMMERCIAL EXPLOITATION: MERCHANDISING

The Licensor is engaged in the business of marketing products and/or concepts based upon Who Dat, Who Dat?, Who Dat! and/or derivatives thereof, and said name, has been trademarked and registered in the Licensor's name. The Licensee desires to advertise and promote the official Saints Who Dat! Fan Club in print and electronic media, and to designate the products and manufacturers (licensed by Licensor), of those products which will be marketed through the fan club catalogue, for publicity purposes, combination sales, premiums, give-aways or similar methods of merchandising and/or sold as the fan club membership package, and to designate the primary distributors for retail sales, which utilize the property described in paragraph 2; and the Licensor is willing to permit the Licensee to do so, on the terms and conditions hereinafter set forth.

NOW THEREFORE in consideration of the premises and of the mutual promises and undertaking herein contained, and for other good and valuable considerations, the parties agree as follows:

1. Grant of License: The Licensor hereby grants to the Licensee, and the Licensee accepts from the Licensor, an exclusive license to utilize the property as described in paragraph 2; upon or in connection with the property as further described in paragraph 3, as used in a football context.

2. Property: The property referred to in paragraph 1 shall consist of the phrase: Who Dat ! as shown on Exhibit "A".

EXHIBIT L

with the design connected therewith, the specific artwork shown in Exhibit "A" has been created by the Licensee, without compensation of design from the Licensor, and remains the exclusive property of the Licensee, which can not be used outside of this agreement.

3.   The Articles and Distribution:  The Licensee shall have the right to cause to be manufactured and sell, as delineated in paragraph 1 hereinabove the official Saints Who Dat! Fan Club membership package, which includes a certificate, mini-pennant, membership card, key fob, lapel pin, button, and bumper sticker, as well as other goods which may be specifically granted in writing, by the licensor.

The Licensee is authorized to designate distributors of Who Dat! goods for retail sales.

It is agreed that Licensee designates Licensor as a distributor and manufacturer of Who Dat! goods for retail sale, for which compensation shall be paid to Licensee as outlined in paragraph 8 herein.   Licensor agrees to use this license judiciously, and will not act in an irresponsible manner in connection with other designated distributors; and will notify Licensee of its intent to distribute goods.

It is understood that Star Promotions of Bensenville, Illinois is a currently designated distributor of retail merchandise; and, that Licensor may deal directly with Star with regard to the licensing of manufacturers of Who Dat! merchandise.

When the Licensee's designated distributor declines participation with an otherwise acceptable prospective manufacturer or if a manufacturer declines participation with the designated distributor, the Licensee may approve the manufacturer (subject to Licensor's approval of manufacturer), without stipulations of exclusive distribution through the designated distributor.

As long as Licensee is the authorized agent representing the New Orleans Saints Who Dat! Fan Club, Licensor

authorizes this license herein.   And the Licensor will not use, license or promote the property defined in paragraph 2 in connection with football, the New Orleans Saints, the NFL or fan clubs of any kind.   The property defined in paragraph 2 is licensed under this agreement for the sole purposes of promoting the fan related programs of the New Orleans Louisiana Saints Limited Partnership.

4.   Territory:  The Licensee's territory shall be the U.S. and any other territory or country deemed beneficial by the Licensee and the Licensor.

5.   Duration:  This agreement shall commence from June 25, 1988 and shall remain in effect as long as the New Orleans Saints Limited Partnership uses the Who Dat name in connection with its fan club; except that as to Sports/Celebrity Incentives, Inc. this agreement shall remain in effect so long as it is contracted to administer the Who Dat! Fan Club of the New Orleans Louisiana Saints Limited Partnership.

6.   Quality, Notices, Approvals, Sample:

(a)  The quality of the Licensed products as well as the quality of all promotional, advertising and packaging material which includes the Property and/or the Trademarks (including the Promotional and Packaging Material) shall be at least as high as the best quality of similar products and promotional, advertising and packaging material presently shipped, distributed, sold and/or used by the Licensee in the licensed territory and shall be in full conformance with all applicable laws and regulations.

(b)  The Licensee may not manufacture or cause to be manufactured, use, offer for sale, sell, advertise, promote, ship and/or distribute any Licensed products nor any promotional or packaging material relating to the Licensed products until it has received written approval of same in the manner provided herein from Licensor.

(c)  The Licensee agrees that all Licensed products and all promotional and packaging material shall contain appropriate

legends, markings and/or notices as required from time to time by the Licensor, to give appropriate notice to the consuming public of the Licensor's right, title and interest thereto. The Licensee agrees that, unless otherwise expressly approved in writing by the Licensor, each usage of the Trademarks shall be followed by either the TM or Circle R Trademark Notice symbol, as appropriate, and initially the following legends shall appear at least once on each Licensed product and on each piece of promotional and packaging material:

Copr. or TM  Who Dat?, Inc., 1988

All Rights Reserved

TM and ® Designate Trademarks of Who Dat?, Inc.

(d)     As part of the consideration in granting this License, the Licensee agrees to defend, with Licensor, Licensor's right, title and interest to said marks as outlined herein.

(e)     In the event that any of the above requirements are not met by Licensee, the Licensor may demand and the Licensee must comply, that the Licensee shall immediately discontinue any and all manufacture, offering for sale, sale, advertising, promotion, shipment and distribution of the Licensed product in connection with which the said quality standard and/or trademark, patent and copyright usage and notice requirements have not been met.

7.     Licensee's Efforts: The Licensee shall exert its best efforts to exploit and promote sales of the Articles, and maintain adequate and necessary arrangements for the distribution, shipment and sale necessary to meet the demand for all such licensed product in all of the licensed territory.

7.A. Licensor's Efforts: The Licensor shall not delay the approval or disapproval of any prospective manufacturer.

8.     Royalty:     In consideration of this license, the Licensee shall pay to the Licensor 5%; however, in no event shall this payment be less than $.25, of the wholesale price of the Who Dat! Fan Club membership premium items, including the following:

membership card, certific

bumper sticker and key fob.   The wholesale price is defined as the price paid by the New Orleans Saints for said items. However, royalties are to be paid on the sale of membership kits sold at retail, and will not include materials used for promotional purposes, including but not limited to a maximum of 100 complimentary membership kits; and, point of purchase support materials.   This payment represents the entire royalty payment for the use of the Who Dat! mark, under this agreement.   It is further, understood that licensed manufacturers of Who Dat! products, that are not for incorporation into the fan club package, shall pay a license royalty to Who Dat!, Inc., directly which is separate and distinct from the royalty referred to herein.

Further, Licensor agrees to pay to Licensee 5% of the manufacturers' selling price to Licensor for goods utilizing the property as described in paragraph 2 and distributed through Licensor.

9.  Accounting:   No later than the 30th day of each calendar month during the term of this agreement and any extension thereof, and thereafter so long as a minimum of 250 members kits sales are made by Licensee, the Licensee shall furnish to the Licensor a full, complete and accurate statement showing the number of sales of Who Dat! Fan Club membership kits, and the pre-set wholesale price paid by the New Orleans Saints. All such records, deemed by licensor, to be necessary to obtain the statements as hereinabove mentioned, may be examined by Licensor's authorized representatives.  This examination shall be allowed by licensee within 72 hours after said request is made; and, shall be done during normal business hours.  All of the accounting records shall be kept in accordance with normally accepted accounting procedures; and in all events, for at least two years after termination of this agreement.

9.A.  No later than the 30th day of each calendar month during the term of this agreement and any extension thereof and thereafter, so long as any sales are made by Licensor, the

Licensor shall furnish to the Licensee a full, complete, and accurate statement showing the number of items sold by Licensor and the pre-set manufacturers selling price.  All such records deemed by Licensee, to be necessary to obtain the statements as herein above mentioned, may be examined by Licensee's authorized representatives. This examination shall be allowed by Licensor within 72 hours after said request is made; and, shall be done during normal business hours.  All of the accounting records shall be kept in accordance with normally accepted accounting procedures.

9.B.  Within 5 days from the signing of this agreement, all money due to Licensor from Licensee, based upon sales of Who Dat membership kits sold as of August 31, 1988, shall be paid.

10.  Payment:  The Licensee shall pay to the Licensor the royalty as outlined hereinabove on a net thirty day basis.  In the event, that said payment is made to Licensee after 60 days, Licensor agrees to pay one (1%) more per month on the amount due and owing.

10.A.  The Licensor shall pay to the Licensee the royalty as outlined hereinabove on a net thirty day basis.  In the event that said payment is made to Licensee after 60 days, Licensor agrees to pay one (1%) per cent more per month on the amount due and owing.

11.  Good Will:  The Licensee and the Licensor acknowledge:

(a)  That the name Saints is a registered trademark of the New Orleans Saints Limited Partnership, for which National Football Properties, Inc. is the exclusive licensing agent;  and

11.A.  Good Will: The Licensee acknowledges:

(a)  That the phrase Who Dat or any of its derivations is unique and original and that the Licensor is the owner thereof;

(b)  That as a result of the exploitation of the Who Dat name and/or character therein and otherwise, the Licensor has acquired a substantial and valuable good will therein;

(c)  That the Who Dat name and/or Character has acquired a secondary meaning, and the Characters themselves have established a meaning distinct from any prototypes on which they may have been based; and

(d)  That any copyrights, trade-marks and design patents heretofore obtained by the Licensor or in connection with the Who Dat name and/or Character are good and valid.

The Licensor has presented a copy of its official copyrights and trademarks for review by the Licensee which warrants the validity of the aforesaid copyrights, trademarks or design patents.

The Licensee shall not during term of this agreement or at any time thereafter, dispute or contest, directly or indirectly the licensor's exclusive right and title to the name and/or character, or the validity of the Licensor's copyrights, trade-marks or design patents thereon, nor shall the Licensee assist or aid others in so doing.  However, the Licensor makes no representation or warranty to the Licensee with regard to the validity or the aforesaid copyrights, trade-marks or design patents.  The Licensee shall cooperate with the Licensor in preventing any infringement thereof.

12.  Advertising:  The Licensee shall have the right in its territory and for the sole purpose of selling, promoting and exploiting the Articles, as hereinabove outlined, to use the property as described in paragraph 2.

The New Orleans Louisiana Saints Limited Partnership has registered, in Class 35, in the State of Louisiana, for advertising and business services in association with promotion of its Who Dat! Fan Club.

Said partnership and Licensee do specifically acknowledge, by means of this agreement, that the Licensor has the right, through first usage, to this registration, and do hereby specifically assign, transfer and convey to Licensor, said registration and will cause said registration to be assigned, transferred, and conveyed immediately.

12.A.   No such material or other advertising or promotional matter of the Property as described in paragraph 2 shall be approved by or implemented by the Licensor without first submitting the same, together with a general outline of the use to be made thereof, to the Licensee for its written approval. This approval is for purposes of conformity to scheduled marketing plans only and does not represent or imply any other rights not specified as part of this agreement.

13.   Limited Grant:   Nothing herein contained shall be construed as an assignment to the Licensee of any right, title or interest in or to the name and/or in or to any copyright, design patent or trade mark of the name and/or Characters or the names applied to them, beyond a grant of limited exclusive license on the terms herein specified.

14.   Indemnity:   The Licensee shall hold the Licensor harmless from and against any loss, expense or damage occasioned by any claim demand, suit or recovery against the Licensor arising out of the unauthorized use of any patent, process, method or device by the Licensee in connection with the Articles.

The Licensee hereby agrees to defend, indemnify and hold the Licensor and/or any of its related entities or assignees harmless against any and all claims, demands, causes of action and judgments arising out of Licensee's design, manufacture, distribution, shipment, advertising, promotion, offering for sale and/or sale of licensed products and/or the promotional and packaging material. With respect to the foregoing indemnity paragraphs, the Licensee agrees to defend and hold the licensor harmless at no cost or expense to the Licensor whatsoever including, but not limited to, attorneys' fees and court costs. The Licensor shall have the right to defend any such action or proceeding with attorneys of its own selection.

14.A.   Protection against Non-Licensees:   The Licensor and the Licensee agree to take action in the event a non-licensed product is discovered for sale within the Licensee's territory. Action must include...

cease and desist letter to the perpetrator from both parties.

15.    Insurance: The Licensee shall, throughout the term of this agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in the State of New York, standard Product Liability Insurance, the form of which must be acceptable to the Licensor, naming the Licensor as an additional insured.   Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the licensed products or any material used in connection therewith or any use thereof. The amount of coverage shall be no less than $1,000,000.00.   The policy shall provide for ten (10) days notice to the Licensor from the insurer by Registered or Certified Mail, return receipt requested, in the event of any modification, cancellation or termination.   The Licensee agrees to furnish the Licensor a certificate of insurance evidencing same within thirty (30) days after execution of this agreement.

16.  Licensee's Breach:  If the Licensee breaches any of the terms and provisions of this agreement on its part to be performed, whether such breach pertains to a default in royalties or otherwise, the Licensor shall have the right, if it so elects, to serve upon the Licensee a written notice of said default, and to allow the Licensee 60 days to rectify the said breach and at its option, if not rectified, to terminate this agreement and/or ask for damages sustained by said breach.

Licensor's Breach:  If the Licensor breaches any of the terms and provisions of this agreement on its part to be performed, whether such breach pertains to a default in royalties or otherwise, the Licensee shall have the right, if it so elects, to serve upon the Licensor a written notice of said default, and to allow the Licensor 60 days to rectify the said breach and at its option, if not rectified, to terminate this agreement and/or ask for damages sustained by said breach.

17.  No Joint Venture: The Licensee shall not use the name

or credit of the Licensor in any manner whatsoever, nor incur any obligation in the Licensor's name. Nothing herein contained shall be construed to constitute the parties as joint venturers, nor shall any similar relationship be deemed to exist between them.

18. No Assignment: The licensee shall have no right to grant any sub-licenses. Any attempt by it to grant a sub-license or to assign, mortgage or part with possession or control of this license or any of its rights hereunder shall constitute a material breach. This agreement shall enure to the benefit of and shall be binding upon the Licensor's successors and assigns.

18.A. Assignment: The Licensor shall have the right to grant licenses and to approve only those manufacturers selected by the Licensee or its designated distributor, unless as stipulated in paragraph 3.

19. Waiver; Modification: No waiver or modification of any of the terms of this agreement shall be valid unless in writing. No waiver by either party of a breach hereof or a default hereunder shall be deemed a waiver by such party of a subsequent breach or default of like or similar nature.

20. Remedies: All specific remedies provided for in this agreement shall be cumulative, and shall not be exclusive of one another or of any other remedies available in law or equity.

21. Notices: Whatever notice is required to be given under this agreement, a writing signed by an officer of the party serving such notice, and mailed by certified mail, return receipt requested, to the other party, shall be deemed good and sufficient notice. Such notices shall be addressed to the parties at their addresses listed on page 1 of this agreement.

22. Construction: This agreement shall be construed in accordance with the laws of the State of Tennessee entirely independent of any forum in which the agreement or any part of it may come up for construction, interpretation or enforcement.

23. Entire Agreement: This agreement contains the entire understanding of the parties. There are no promises or ...

warranties, promises, covenants or undertakings other than those hereinabove contained.

IN WITNESS WHEREOF the parties hereto have caused these presents to be signed by their duly authorized officers on this 3rd day of September, 1988.

Attest:                                          WHO DAT?, INC.

_____              By _____

Secretary                                         Authorized Officer

                                                       SPORTS/CELEBRITY
                                                       INCENTIVES, INC.

Attest:

_____              By _____
Secretary                                         DON CALARCO

I have read the entire agreement hereinabove written, and acknowledge and agree to all of its terms and conditions.

New Orleans, Louisiana this 3rd day of September, 1988.

New Orleans Louisiana Saints Limited Partnership

by _____
            Greg Suit

*The Coca-Cola Company*

COCA-COLA PLAZA
ATLANTA, GEORGIA

Livingstone Johnson
Executive Counsel
Office of The General Counsel
404 676-3511

ADDRESS REPLY TO
P. O. DRAWER 1734
ATLANTA, GA 30301
404 676-2121

February 11, 2010

Mr. Ricardo G. Cedillo
Davis, Cedillo & Mendoza, Inc.
McCombs Plaza Suite 500
755 E. Mulberry Avenue
San Antonio, TX 78212-3135

Via U.S. Postal Service
and Via Facsimile:  210-822-1151

    Re:  Who Dat? Inc.

Dear Mr. Cedillo:

This correspondence is in response to your letter of February 8, 2010, addressed to numerous executives of The Coca-Cola Company ("the Company").  I am Executive Counsel at the Company and going forward, all communications regarding this matter should be sent to me.

As the owner of one of the world's most recognizable brands, the Company makes every effort to ensure that it does not infringe upon third party's intellectual property rights.  Accordingly, we immediately reviewed this matter and to our knowledge, the Company has not used the wording WHO DAT on any products, advertisements, point of sale materials or the like.  As we are willing to look into this matter further, we require additional details regarding the use that you referenced.  In particular, it would be helpful to know when, where and how the WHO DAT wording was used in connection with the Company.

During our research of this matter, it was brought to our attention that there are several third party claims/uses of the wording WHO DAT, both in common law and on the USPTO registry.  In addition, at various times at the USPTO, NFL Properties LLC has claimed rights to WHO DAT.  Further, according to recent news articles, the NFL has sought to restrict third party uses of WHO DAT when the wording is coupled with the Saints' colors or other insignia.

EXHIBIT M

Mr. Ricardo G. Cedillo
Davis, Cedillo & Mendoza, Inc.
February 11, 2010
Page Two

At present, it is unclear who has superior rights (and to what extent) but nonetheless, we will continue our diligence to ensure that we are not infringing any rights.  We await additional details from you and look forward to resolving this matter amicably.

This letter is written without prejudice to any and all rights and remedies of the Company in connection with this matter.

Sincerely yours,

Livingstone Johnson
Executive Counsel



EXHIBIT N